**UNITED STATES v. DENNIS et al.**

No. 242, Docket 21538.

United States Court of Appeals
Second Circuit.

Argued June 21, 22, 23, 1950.

Decided Aug. 1, 1950.

Writ of Certiorari Granted Oct. 23, 1950.
See 71 S.Ct. 91.

See, also, 176 F.2d 78, 169.

Eugene Dennis, pro se.

Richard Gladstein, San Francisco, Cal., for appellants Robert G. Thompson and Gus Hall.

Abraham J. Isserman, Los Angeles, Cal., for appellants Gilbert Green and John B. Williamson.

Louis F. McCabe, Philadelphia, Pa., for appellant Henry Winston.

Harry Sacher, New York City, for appellants Irving Potash and John Gates.

Irving S. Shapiro, Robert W. Ginnane and Frank H. Gordon, Special Assistants to the Attorney General, for the United States plaintiff-appellee. J. Howard McGrath, Attorney General, Philip B. Perlman, Solicitor General, Washington, D. C., Peyton Ford, Deputy Attorney General, James M. McInerney, Assistant Attorney General, Irving H. Saypol, United States Attorney, New York City, Edward C. Wallace, Special Assistant to the Attorney General, Lawrence K. Bailey and George D. Webster, Attorneys, Department of Justice, Washington, D. C., were with them on the brief.

Osmond K. Fraenkel, New York City (Eastman Birkett, Joseph H. Flom, Osmond K. Fraenkel, Arthur Garfield Hays, all of New York City, of counsel), for American Civil Liberties Union, amici curiae.

Before L. HAND, SWAN and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The defendants Dennis and others appeal from a judgment of conviction upon an indictment for violation of Section 3 of the "Smith Act," [1] that is, for "wilfully and knowingly" conspiring to organize the Communist Party of the United States as a group to "teach and advocate the overthrow and destruction" of the government "by force and violence," and "knowingly and wilfully to advocate and teach the duty and necessity of overthrowing and destroying" the government by "force and violence." All the defendants were at one time or another officials of the Party during the period laid in the indictment—April

George W. Crockett, Jr., Washington, D. C., for appellants Carl Winter and Jacob Stachel.

Benjamin J. Davis, Jr., pro se.

1. § 11, Title 18, U.S.C. (1946 Ed.) [1948 Revised Criminal Code, 18 U.S.C.A. § 2385].

1, 1945, to July 20, 1948. The case was tried at great length. The defendants challenged the array, and the trial of that issue extended from January 20, 1949, to March 1, 1949; the trial of the issues began the following week and went on continuously until September 23, 1949. The jury brought in a verdict against all the defendants on October 14, 1949, and they were sentenced on October 21, 1949. The trial of the challenge to the array took 23 days; the government's case on the issues took 40 days, and the appellants, 75 days.

Logically the first issue, and incidentally the most important, is whether the evidence was sufficient to support the jury's verdict that the defendants were guilty of the crime charged in the indictment. There was abundant evidence, if believed, to show that they were all engaged in an extensive concerted action to teach what indeed they do not disavow—the doctrines of Marxism-Leninism. These doctrines were set forth in many pamphlets put in evidence at the trial, the upshot of which is—indeed an honest jury could scarcely have found otherwise—that capitalism inescapably rests upon, and must perpetuate, the oppression of those who do not own the means of production; that to it in time there must and will succeed a "classless" society, which will finally make unnecessary most of the paraphernalia of government; but that there must be an intermediate and transitional period of the "dictatorship, of the proletariat," which can be established only by the violent overthrow of any existing government, if that be capitalistic. No entrenched bourgeoisie, having everything to lose and nothing to gain by the abolition of capitalism, by which alone it can continue to enjoy its privileged position, will ever permit itself to be superseded by the means which it may have itself provided for constitutional change: e. g., by the ballot. No matter how solemnly it may profess its readiness to abide the result, and no matter how honestly and literally the accredited processes of amendment may in fact be followed, it is absurd to expect that a bourgeoisie will yield; and indeed to rely upon such a possibility is to range oneself among the enemies of Marxist-Leninist principles. Therefore the transition period involves the use of "force and violence," temporary it is true, but inescapable; and, although it is impossible to predict when a propitious occasion will arise, one certainly will arise: as, for example, by financial crisis or other internal division. When the time comes the proletariat will find it necessary to establish its "dictatorship" by violence.

■■■ The defendants protest against this interpretation of their teaching and advocacy. They say that the use of "force and violence" is no part of their program, except as it may become necessary after the proletariat has succeeded in securing power by constitutional processes. Thereafter, being itself the lawful government, it will of course resist any attempt of the ousted bourgeoisie to regain its position; it will meet force with force as all governments may, and must. If the defendants had in fact so confined their teaching and advocacy, the First Amendment would indubitably protect them, for its protects all utterances, individual or concerted, seeking constitutional changes, however revolutionary, by the processes which the Constitution provides. Any amendment to the Constitution passed in conformity with Article V is as valid as though it had been originally incorporated in it; the only exception being that no state shall be denied "its equal Suffrage in the Senate." It is unnecessary to quote in detail the many passages in the pamphlets and books, published and disseminated by the defendants, which flatly contradict their declarations that they mean to confine the use of "force or violence" to the protection of political power, once lawfully obtained. The prosecution proved this part of its case quite independently of the testimony of its witnesses, though the jury might have relied upon that, had it stood alone. The sufficiency of the evidence therefore comes down to whether it is a crime to form a conspiracy to advocate or teach the duty and necessity of overthrowing the govern-

ment by violence, and to organize the Communist Party as a group so to teach and to advocate.

This being true, three questions arise: (1) whether the Act is constitutional as the judge construed it, (2) whether his construction was right, and (3) whether the evidence was admissible under the indictment. To the last of these we shall devote no time, for it is patent on the merest inspection that the indictment is sufficient; even had it not been, any variances would have been harmless error. Fed. Rules Crim.Proc. rule 52(a), 18 U.S.C.A. Coming then to the first point, although the interest which the Amendment was designed to protect—especially as regards matters political—does not presuppose that utterances, divergent from current official opinion, are more likely to be true than that opinion, it does presuppose that official opinion may be wrong, and that one way—and perhaps the best way— to correct or supplement it, is complete freedom of criticism and protest. This may convince the officials themselves, and in any event it may rouse up a body of contrary opinion to which they will yield, or which will displace them. Thus, the interest rests upon a skepticism as to all political orthodoxy, upon a belief that there are no impregnable political absolutes, and that a flux of tentative doctrines is preferable to any authoritative creed. It rests upon a premise as yet unproved, and perhaps incompatible with men's impatience of a suspended judgment when the stakes are high. However, it concerns beliefs alone, not actions, except in so far as a change of belief is a condition upon action.

Nobody doubts that, when the leader of a mob already ripe for riot gives the word to start, his utterance is not protected by the Amendment. It is not difficult to deal with such situations; doubt arises only when the utterance is at once an effort to affect the hearers' beliefs and a call upon them to act when they have been convinced. As a

new question it might have been held that the Amendment did not protect utterances, when they had this double aspect: i. e., when persuasion and instigation were inseparably confused. In that view the Amendment would give protection to all utterances designed to convince, but its protection would be conditional upon their not being part of, or coupled with, provocation to unlawful conduct, whether that was remote or immediate. True, one does not become an accessory to a crime who "counsels, commands, induces * * * its commission." [2] unless the crime is committed; but he will be guilty of conspiracy by the mere agreement; and it will not protect him that the objective of the conspiracy is lawful, and only the means contemplated are illegal.[3] Had this view of the Amendment been taken, although the utterances of these defendants so far as they attempted to persuade others of the aims of Communism would have been protected, they would have lost that protection, coupled as they were with the advocacy of the unlawful means. And that is probably in fact true of utterances not political or religious; for it is at least doubtful whether other kinds of utterance, however lawful in so far as they were persuasive only, would retain their privilege if coupled with appeals to unlawful means. One can hardly believe that one would be protected in seeking funds for a school, if he suggested that they should be obtained by fraud. His privilege would be conditional upon separating the means from the end. However, that may be, it is not true of political agitation and the question is what limits, if any, the advocacy of illegal means imposes upon the privilege which the aims or purposes of the utterer would otherwise enjoy.

The Supreme Court has certainly evinced a tenderness towards political utterances since the first World War. In Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470, the accused had been convicted of distributing a broadside which obstructed the draft, and his conviction was af-

2. § 2(a) Title 18, U.S.C.A.

3. Truax v. Corrigan, 257 U.S. 312, 327, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375.

firmed. It is clear that this was upon the theory that his purpose had been to bring about the "substantive evil," with which it was within the power of Congress to deal. Holmes, J., went on to say, however, by way of limitation, that even in such cases the danger that the "evil" might be realized must be "clear and present"; though he must have supposed that the distribution of the broadside created such a danger. In Abrams v. United States, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173, the majority of the Court on the other hand appear to have found it enough that the purpose of the accused was to bring about the "substantive evil"; at least they did not raise any question as to its gravity or its imminence; but Holmes and Brandeis, JJ., dissented, first, because they did not think that the accused's purpose was to hinder the prosecution of the war, and second, because the danger was trivial and remote. Schaefer v. United States, 251 U.S. 466, 40 S.Ct. 259, 64 L.Ed. 360, concerned a situation substantially the same, and adds nothing, so far as we can see. Next came Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, where a New York statute, under which the accused had been convicted, was so close to parts of the statute at bar that it must have been its model *pro tanto*. The majority held that it was enough that the pamphlet, broadcast by the accused, "advocates and urges in fervent language mass action which shall * * * overthrow and destroy organized parliamentary government"; and that it used "the language of direct incitement". 268 U.S. at page 665, 45 S.Ct. at page 629, 69 L.Ed. 1138. Once more Holmes and Brandeis, JJ., however, dissented because "there was no present danger of an attempt to overthrow the government by force on the part of the admittedly small minority who share the defendant's views. * * * If the publication * * * had been laid as an attempt to induce an uprising * * * at once and not at some indefinite time in the future, it would have presented a different question," unless perhaps even then "it was not futile and too remote from possible consequences". 268 U.S. at page 673, 45 S.

Ct. at page 632, 69 L.Ed. 1138. This case arose under state law, but all the judges agreed that the First Amendment applied to it, though possibly without so strong a grip as though it had been a federal law. It has been often cited in the twenty-five years that have passed, never with disapproval and frequently as authoritative. On the other hand it would be uncandid to say that the dissent did not make the immediacy of the "substantive evil" a condition of the unlawfulness of even direct incitement to rebellion; though it is to be noted that the dissenters also dwelt upon the improbability that the paltry efforts of the accused could effect their purposes within any period which need to be reckoned with. Whitney v. People of State of California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095, which followed shortly thereafter, presented no different question, and the concurrence of Brandeis, J., was explicit that he would hold a conspiracy protected, though its execution were deferred to the first propitious moment. 274 U.S. at pages 376, 377, 47 S.Ct. 641, 71 L.Ed. 1095. Yet here too the reasoning should be remembered, for it was that delay in execution would give opportunity for the corrective of public discussion. It does not follow that he would have been of the same opinion, if the conspirators had sought to mask their purposes by fair words, as they did in the case at bar. Moreover, it is to be particularly observed that the concurrence said that the Court had not yet fixed the standard by which to determine "when a danger shall be deemed clear; how remote the danger may be and yet be deemed present". 274 U.S. at page 374, 47 S.Ct. at page 648, 71 L.Ed. 1095.

In Stromberg v. People of State of California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484, the majority reversed a conviction because it thought the statute too vague to serve as a guide to conduct; but it explicitly recognized "that the State may thus provide for the punishment of those who indulge in utterances which incite to violence and crime and threaten the overthrow of organized government by unlawful means. There is no constitutional immunity for such conduct abhorrent to

our institutions. Gitlow v. People of State of New York, supra; Whitney v. People of State of California, supra", 283 U.S. at pages 368, 369, 51 S.Ct. at page 535, 75 L. Ed. 1117, 73 A.L.R. 1484. In Herndon v. State of Georgia, 295 U.S. 441, 55 S.Ct. 794, 79 L.Ed. 1530, the majority found it possible to avoid the constitutional question, but Brandeis, Stone and Cardozo, JJ., dissented. Cardozo, J., who wrote the dissent, discussed in detail, Gitlow v. People of State of New York, and very carefully avoided any suggestion that it had not been correctly decided. He thought that "the effect of all this" (that is, of the later opinions) "was to leave the question open whether in cases * * * where the unlawful quality of words is to be determined not upon their face but in relation to their consequences, the opinion in Schenck v. United States supplies the operative rule". 295 U.S. at page 451, 55 S.Ct. at page 798, 79 L.Ed. 1530. We read this as meaning that the rule of "clear and present danger" might be properly limited to situations in which the words were not themselves those of direct instigation. We do not see that De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278, adds anything except that here also Gitlow v. People of State of New York and Whitney v. People of State of California were cited with apparent approval. Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1006, reversed a conviction because a state statute was too vague, like that before the court in Stromberg v. People of State of California, supra;[4] Gitlow v. People of State of New York being discussed at length without any intimation of dissidence.

All the foregoing cases concerned the validity of statutes which had made it unlawful to stir up opposition to the Government or a state in the discharge of some vital function. There followed several which held that an ordinance or statute might not trench upon freedom of speech in order to promote minor public convenience: e.g., preventing the streets from being littered by broadsides, Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; requiring a license to solicit contributions for societies, Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; requiring a union leader to register his name and union affiliation with the Secretary of State, Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. The opinions in all these cases did however repeat the rubric of Schenck v. United States, supra,[5] though none of them attempted to define how grave, or how imminent the danger must be, or whether the two factors are mutually interdependent. Moreover, the situation in all was wholly different from that in the preceding decisions. It is one thing to say that the public interest in keeping streets clean, or in keeping a register of union leaders, or in requiring solicitors to take out licenses, will not justify interference with freedom of utterance (and the last decision of the Court is to the contrary, Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608); but it is quite another matter to say that an organized effort to inculcate the duty of revolution may not be repressed. It does not seem to us therefore that these decisions help towards a solution here.

Three decisions involving punishment for contempt of court stand upon a different footing: Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; and Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546. In each the question was whether the Fourteenth Amendment, incorporating as it does the First, protected against criminal contempt one who published abuse of a judge while a case was pending before him. These opinions also repeated the rubric, but throw no light upon its meaning, and in any case. there could be no issue as to the imminency of the danger, for, whatever effect the abuse might have upon the judge's decision, it would be either immediate, or at most delayed no longer than his period of

4. 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484.

5. 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470.

deliberation. Moreover, in Pennekamp v. State of Florida, the majority said that courts must "appraise the comment on a balance between the desirability of free discussion and the necessity for fair adjudication, free from interruption". 328 U.S. at page 336, 66 S.Ct. at page 1032, 90 L.Ed. 1295. One must "weigh the right of free speech * * * against the danger of the coercion and intimidation of courts", 328 U.S. at page 346, 66 S.Ct. at page 1037, 90 L.Ed. 1295. And again, "What is meant by clear and present danger to a fair administration of justice? No definition could give an answer". 328 U.S. at page 348, 66 S.Ct. at page 1038, 90 L.Ed. 1295. Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, also stands apart; it held that the prosecution had not adequately proved that Schneiderman, though a Communist, was not "attached to the principles of the Constitution," when he was naturalized. The majority thought that being a Communist might involve no more than what the defendants at bar say that it does involve: to foster revolutionary changes, but only by lawful methods. All that can be thought relevant to the case at bar is a passage in the opinion, which may have been meant to imply that only "agitation and exhortation calling for present violent action which creates a clear and present danger of public disorder or other substantive evil", 320 U.S. at page 157, 63 S.Ct. at page 1352, 87 L.Ed. 1796, will show that one is not attached to the "principles of the Constitution." Of the eight justices who took part in the decision, three dissented, and of the five who concurred two wrote separate opinions. It is true that both these said that they joined in the opinion in chief; but we should hesitate to say that by this they meant to commit themselves to the proposition that a man may be attached to the principles of a constitution, whose violent overthrow he will continue to advocate and teach, because he knows that the execution of his purpose must be deferred for a time. We should feel bound to await a more definite declaration before accepting a doctrine, which, with deference, seems to us so open to doubt.

In Hartzel v. United States, 322 U.S. 680, 64 S.Ct. 1233, 88 L.Ed. 1534, a prosecution under the Espionage Act,[6] the question was whether the accused had "wilfully" tried to cause insubordination, and the majority held that "wilfully" confined the forbidden utterance to what was specifically intended to bring about the evil, and then only in case there was a "clear and present danger" of its success. 322 U.S. at pages 686, 687, 64 S.Ct. at page 1236, 88 L.Ed. 1534. Four justices thought that no specific intent had been proved and did not find it necessary to pass upon whether there was the prescribed danger; four thought the specific intent proved and said nothing as to the proximity of the danger; Roberts, J., merely said that the evidence was insufficient. Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, and Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 895, 93 L.Ed. 1131, concerned statutes or ordinances which made unlawful speeches that were likely to create disorders or other "breaches of the peace." Concededly the accused had not intended the "substantive evil" to occur, though he was probably indifferent about it, and may have thought disorder likely to result. In the first case the conviction was affirmed; in the second it was reversed. Whatever danger there was, was sure to be immediate, and the cases are not helpful here.

Nor is the law as to enjoining peaceful picketing altogether plain. In Thornhill v. State of Alabama, 310 U.S. 88, 66 S.Ct. 736, 84 L.Ed. 1093, the Court declared unconstitutional a state statute which forbad such picketing in an ordinary labor dispute. It held that picketing, when unaccompanied by threats or violence, was no more than an appeal to others to side with the union. However, in Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834, it upheld a state statute which authorized courts to enjoin such picketing in what seems to us to have amounted to a secondary boycott. An ice peddlers' union

6. § 31 et seq., Title 50, U.S.C.A. [1948 Revised Criminal Code, 18 U.S.C.A. § 793 et seq.].

wished to compel some unwilling peddlers to join, and in order to do so picketed an ice plant which refused to stop supplying ice to the recalcitrants. That conduct the state statute forbad, and the Court held that it was constitutional, as part of the remedy, to enjoin picketing, although that consisted only in trying to persuade others to join in the unlawful effort. The "evil"—injury to the defendant's business—was "present" enough, and apparently it was important enough to justify even a prevention of the utterance in advance. In International Brotherhood of Teamsters, etc., Union Local 309, v. Hanke, 339 U.S. 470, 70 S.Ct. 773, a partnership of four was conducting a business which included the sale of second-hand motor cars. They had no employees, but their predecessor had conducted a union shop, and the senior partner had joined the union when he bought the business. Later the partners resigned from the union because they were unwilling to abide by the union rules as to the hours of business. Although there was no statute which made the union's conduct unlawful, a majority of the Court held that the question was of balancing conflicting interests, and that the state was free to decide which interest should prevail, whether by its legislature or by its courts.

The last decision—in some ways the most important of all—is American Communications Association, C. I. O. v. Douds, 339 U.S. 382, 70 S.Ct. 674, in which a majority of the Court held that § 9(h) of the Labor-Management Act[7] was constitutional in requiring the officers of a union to take an oath that they were not Communists, as a condition to according the union the benefits of the Act. All the opinions seem to us to have accepted it as a condition upon any limitation upon freedom of utterance that there must be some "clear and present danger" that the utterance will succeed in creating a "substantive evil" within the control of Congress. The opinion in chief, however, cautioned that this was not to be applied "as a mechanical test * * * without regard to the context of its application." "It is the considerations that gave birth to the phrase * * * not the phrase itself, that are vital". 339 U.S. at page 394, 70 S.Ct. at page 681. Again, "even harmful conduct cannot justify restrictions upon speech unless substantial interests of society are at stake. But * * * it was never the intention of this Court to lay down an absolute test measured in terms of danger to the Nation". 339 U.S. at page 397, 70 S.Ct. at page 683. "When particular conduct is regulated in the interest of public order, and the regulation results in an indirect, conditional, partial abridgment of speech, the duty of the courts is to determine which of these two conflicting interests demands the greater protection under the particular circumstances presented". 339 U.S. at page 399, 70 S.Ct. at page 684. "We must therefore, undertake the 'delicate and difficult task * * * to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights.' Schneider v. State, 1939, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155". 339 U.S. at page 400, 70 S.Ct. at page 684. The significance of the decision for the purposes of the case at bar does not, however, lie in the language used, so much as in the decision itself; not indeed because the conflict of interest which the Court there resolved, was the same as that before us, but because the test applied was the same as in the case of a criminal prosecution for utterances threatening the stability of the government: i.e., "clear and present danger"; and because this was used to weigh the danger to commerce considering its gravity and proximity, against the repression of political activity involved—indeed a minority included even repression of political belief. The danger in that case included "political" strikes, and the danger to commerce from such strikes is closer than the danger to the existence of the government is to the teachings of the defendants; but the second danger is vastly graver if it be realized. We do not pretend that the decision is authoritative here; indeed the Court carefully declared that it was limited to the situation then at bar.

7. § 159(h), Title 29 U.S.C.A.

What we do say is that no longer can there be any doubt, if indeed there was before, that the phrase, "clear and present danger," is not a slogan or a shibboleth to be applied as though it carried its own meaning; but that it involves in every case a comparison between interests which are to be appraised qualitatively.

From this wearisome analysis of the decisions of the Supreme Court it has appeared, as we indicated at the outset, that to deprive an utterance of the protection of the Amendment it is not always enough that the purpose of the utterer may include stirring up his hearers to illegal conduct— at least, when the utterance is political. The same utterance may be unprotected, if it be a bare appeal to action, which the Amendment will cover, if it be accompanied by, or incorporated into, utterances addressed to the understanding and seeking to persuade. The phrase, "clear and present danger," has come to be used as a shorthand statement of those among such mixed or compounded utterances which the Amendment does not protect. Yet it is not a *vade mecum;* indeed, from its very words it could not be. It is a way to describe a penumbra of occasions, even the outskirts of which are indefinable, but within which, as is so often the case, the courts must find their way as they can. In each case they must ask whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger. We have purposely substituted "improbability" for "remoteness," because that must be the right interpretation. Given the same probability, it would be wholly irrational to condone future evils which we should prevent if they were immediate; that could be reconciled only by an indifference to those who come after us. It is only because a substantial intervening period between the utterance and its realization may check its effect and change its importance, that its immediacy is important; and that, as we have said, was the rationale of the concurrence in Whitney v. People of State of California, supra.[8] We can never forecast with certainty; all prophecy is a guess, but the reliability of a guess decreases with the length of the future which it seeks to penetrate. In application of such a standard courts may strike a wrong balance; they may tolerate "incitements" which they should forbid; they may repress utterances they should allow; but that is a responsibility that they cannot avoid. Abdication is as much a failure of duty, as indifference is a failure to protect primal rights.

In the case at bar the defence seems to us to kick the beam. One may reasonably think it wiser in the long run to let an unhappy, bitter outcast vent his venom before any crowds he can muster and in any terms that he wishes, be they as ferocious as he will; one may trust that his patent impotence will be a foil to anything he may propose. Indeed, it is a measure of the confidence of a society in its own stability that it suffers such fustian to go unchecked. Here we are faced with something very different. The American Communist Party, of which the defendants are the controlling spirits, is a highly articulated, well contrived, far spread organization, numbering thousands of adherents, rigidly and ruthlessly disciplined, many of whom are infused with a passionate Utopian faith that is to redeem mankind. It has its Founder, its apostles, its sacred texts—perhaps even its martyrs. It seeks converts far and wide by an extensive system of schooling, demanding of all an inflexible doctrinal orthodoxy. The violent capture of all existing governments is one article of the creed of that faith, which abjures the possibility of success by lawful means. That article, which is a common-place among initiates, is a part of the homiletics for novitiates, although, so far as conveniently it can be, it is covered by an innocent terminology, designed to prevent its disclosure. Our democracy, like any other, must meet that faith and that creed on the merits, or it will perish; and we must not flinch at the challenge. Nevertheless, we may insist that the rules of the game be observed, and

8. 274 U.S. 357, 372, 47 S.Ct. 641, 71 L. Ed. 1095.

the rules confine the conflict to weapons drawn from the universe of discourse. The advocacy of violence may, or may not, fail; but in neither case can there be any "right" to use it. Revolutions are often "right," but a "right of revolution" is a contradiction in terms, for a society which acknowledged it, could not stop at tolerating conspiracies to overthrow it, but must include their execution. The question before us, and the only one, is how long a government, having discovered such a conspiracy, must wait. When does the conspiracy become a "present danger"? The jury has found that the conspirators will strike as soon as success seems possible, and obviously, no one in his senses would strike sooner. Meanwhile they claim the constitutional privilege of going on indoctrinating their pupils, preparing increasing numbers to pledge themselves to the crusade, and awaiting the moment when we may be so far extended by foreign engagements, so far divided in counsel, or so far in industrial or financial straits, that the chance seems worth trying. That position presupposes that the Amendment assures them freedom for all preparatory steps and in the end the choice of initiative, dependent upon that moment when they believe us, who must await the blow, to be worst prepared to receive it.

We need not say that even so thoroughly planned and so extensive a confederation would be a "present danger" at all times and in all circumstances; the question is how imminent: that is, how probable of execution—it was in the summer of 1948, when the indictment was found. We must not close our eyes to our position in the world at that time. By far the most powerful of all the European nations had been a convert to Communism for over thirty years; its leaders were the most devoted and potent proponents of the faith; no such movement in Europe of East to West had arisen since Islam. Moreover in most of West Europe there were important political Communist factions, always agitating to increase their power; and the defendants were acting in close concert with the movement. The *status quo*, hastily contrived in 1945, was showing strains and tensions, not originally expected. Save for the unexpected success of the airlift, Britain, France and ourselves would have been forced out of Berlin, contrary to our understanding of the convention by which we were there. We had become the object of invective upon invective; we were continuously charged with aggressive designs against other nations; our efforts to reëstablish their economic stability were repeatedly set down as a scheme to enslave them; we had been singled out as the chief enemy of the faith; we were the eventually doomed, but the still formidable, protagonist of that decadent system which it was to supplant. Any border fray, any diplomatic incident, any difference in construction of the *modus vivendi*—such as the Berlin blockade we have just mentioned—might prove a spark in the tinder-box, and lead to war. We do not understand how one could ask for a more probable danger, unless we must wait till the actual eve of hostilities. The only justification which can be suggested is that in spite of their efforts to mask their purposes, so far as they can do so consistently with the spread of the gospel, discussion and publicity may so weaken their power that it will have ceased to be dangerous when the moment may come. That may be a proper enough antidote in ordinary times and for less redoubtable combinations; but certainly it does not apply to this one. *Corruptio optimi pessima.* True, we must not forget our own faith; we must be sensitive to the dangers that lurk in any choice; but choose we must, and we shall be silly dupes if we forget that again and again in the past thirty years, just such preparations in other countries have aided to supplant existing governments, when the time was ripe. Nothing short of a revived doctrine of *laissez faire*, which would have amazed even the Manchester School at its apogee, can fail to realize that such a conspiracy creates a danger of the utmost gravity and of enough probability to justify its suppression. We hold that it is a danger "clear and present."

However, although for the foregoing reasons we agree with the Eighth Cir-

cuit[9] that the Smith Act is constitutional, so limited, it does not follow that as matter of interpretation it may be so limited, or that the judge was justified in charging the jury that they need only find the defendants meant to use violence "as speedily as circumstances would permit it" (the overthrow or destruction of the government) "to be achieved." The words of the Act are unconditional and forbid advocacy or teaching of such a violent overthrow at any time and by anyone, weak or strong; literally, they make criminal the fulminations of a half crazy zealot on a soap box, calling for an immediate march upon Washington. Therefore, the defendants argue that, if the Act is to be limited as it must be to be valid, Congress must limit it; and further, that, if it were so limited, it would become too vague to serve as a definition of crime. We think not. Section 40 of the original act[10] provided by a not uncommon clause, not only that "if any provision" were "held invalid, the remainder of the Act," should not be affected; but also that, if "the application thereof to any person or circumstance is held invalid * * * the application * * * to other persons or circumstances" should not be affected. Even when there is no "separability" clause of any kind, the doctrine of United States v. Reese, 92 U.S. 214, 23 L.Ed. 563, does not always apply; the Supreme Court has often limited general words in a statute so as to make it constitutional,[11] although in such cases a court must hazard the inference that Congress would have enacted the statute in the limited form, if it had known that in its broad scope it would be unconstitutional. We have no such problem here, because there can be no doubt as to the intent; Congress has explicitly declared that it wished the words to govern all cases which they constitutionally could. Nor do we think that, so limited, the Act becomes too vague to stand up, which is the only

challenge on the score of vagueness that deserves discussion. In the first place, it is to be observed that it would have been impracticable to provide against the evil and yet to define the forbidden conduct more definitely. True, one might have added in § 2(a) (1) [1948 Revised Criminal Code 18 U.S.C.A. § 2385] after the word "teach" the clause: "when that constitutes a clear and present danger"; and in § 2(a) (3) the same clause after the words "help to organize." But that would not have helped to define the forbidden conduct; for, not only are those words imprecise in themselves, and were never intended to be otherwise; but, as we have seen, they presuppose balancing the repression necessary to avoid the evil, against the evil itself, discounted by the improbability of its occurrence. That is a test in whose application the utmost differences of opinion have constantly arisen, even in the Supreme Court. Obviously it would be impossible to draft a statute which should attempt to prescribe a rule for each occasion; and it follows, as we have said, either that the Act is definite enough as it stands, or that it is practically impossible to deal with such conduct in general terms. Such a consideration is relevant in judging the constitutionality of any statute. United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877.

There is an added reason leading to the same result. Both § 2(a) (1) and § 2(a) (3) make advocacy and teaching of revolution criminal only when it is with a specific intent—the intent to do so by "force or violence." Obviously one cannot teach or advocate the use of violence without specifically intending to bring about its use; a fortiori must that be true, if one organizes a group so to teach. All discussion as to the use of the word "wilfully" in the alternative in § 2(a) (1) is therefore irrelevant; the sections carry

9. Dunne v. United States, 138 F.2d 137.

10. 54 St. at L. 676.

11. The Abby Dodge, 223 U.S. 166, 32 S. Ct. 310, 56 L.Ed. 390; Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232; United States v. Walter, 263

U.S. 15, 44 S.Ct. 10, 68 L.Ed. 137; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; American Power Company v. Securities and Exchange Commission, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103.

their own specific intent, and that intent violates the accepted mores of our society, which discountenance resort to violence as a means of political change. When a statute is directed against conduct which offends accepted moral standards, and particularly when the moral offense is heinous, ambiguities do not count against its validity as much as they do when the proscribed conduct has no ethical significance, as, for instance, when it is only an economic regulation, United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045. Thus, in Gorin v. United States, 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488, a conviction was affirmed under a statute which punished making copies of "anything connected with the national defense," or "relating to" it, because the statute was limited to cases where the forbidden act was done "for the purpose of obtaining information * * * with intent or reason to believe that the information to be obtained is to be used to the injury of the United States." Those words, the court said, required "those prosecuted to have acted in bad faith," which was "sufficiently definite to apprise the public of prohibited activities" 312 U.S. at page 28, 61 S.Ct. at page 434, 85 L.Ed. 488. Again, in United States v. Ragen, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383, although the crime depended upon whether the accused paid more than "reasonable" commissions, the statute was held valid because it was limited to deductions, made "willfully." "That such acts of bad faith are not beyond the ready comprehension either of persons affected by the act or of juries called upon to determine violations need not be elaborated." "A mind intent upon willful evasion is inconsistent with surprised innocence". 314 U.S. at page 524, 62 S.Ct. at page 378, 86 L.Ed. 383. This is a rational exception to the doctrine that the words of a statute must not be too vague to guide those who wish to conform to it; it means that, though the forbidden conduct be itself defined in ambiguous terms, the ambiguity will be cleared up, if the statute adds as a condition that the conduct is criminal only in case the accused knows that what he intends is wrong. To apply the doctrine to such persons would only serve to relieve them of the risk of incorrectly guessing the right meaning of the words, when engaged in an undertaking that they know to be wrong. In the case at bar the doctrine would mean that those, who set in train of execution an elaborate scheme of violent revolution, will escape because the literal meaning of the words covers others, too insignificant to be noticed. The defendants have no standing as vicarious champions of such offenders. We hold the Smith Act to be constitutional, as the judge construed it; and that evidence supported the verdict of the jury.

It will be most convenient now to consider also the defendants' exception to that part of the judge's charge which took from the jury all questions regarding the constitutionality of the Act, and only left to them whether the defendants' intent was to overthrow the government "as speedily as circumstances would permit it to be achieved." As we have said, "clear and present danger" depends upon whether the mischief of the repression is greater than the gravity of the evil, discounted by its improbability; and it is of course true that the degree of probability that the utterance will bring about the evil is a question of fact. On the other hand, to compare the repression with the evil, when discounted, is not a question of fact at all; for it depends upon a choice between conflicting interests. Ordinarily such choices are for a legislature, whose chief function it is indeed to make them, since a legislature is best qualified to represent the divergent interests of society. However, as we have just said, it is at times impracticable to make such choices in general propositions, because the occasions which will arise within the ambit of the general purpose, are multiform. Sometimes, these choices are delegated initially to administrative tribunals, subject to a court review; sometimes—notably in the case of the Anti-Trust Acts—they are left to the courts, first and last. It is true that similar choices—choices of the proper standard to be applied ad hoc— are sometimes also left to juries: negligence and reasonable notice are instances. But these usually concern only individuals

involved in a private suit, not the conflict of momentous public interests; and it would be improper to take them as exemplifying a universal principle. When the dispute does involve interests of high moment, and Congress, thinking it impracticable to deal with them specifically, makes the courts its surrogate, the choices so delegated must be treated as questions of law. Were it not so, there would be no chance for review, for the verdict would be final; moreover, different juries might give different verdicts, and any approach to uniformity, short as that can be in any event in this field, would be impossible. We do not forget that the majority of the Court in Pierce v. United States, 252 U.S. 239, 250, 40 S.Ct. 205, 209, 64 L.Ed. 542, said that "the probable effect of distributing it" (a challenged pamphlet) "in the mode adopted" was among those issues which should be left to a jury. The question to which that remark was addressed, was however only whether the evidence supported the verdict; and, so far as appears, the accused had not asked that the court should pass upon the pamphlet. For these reasons the judge appears to us to have been right, when in the case at bar he took upon himself the duty of declaring that the defendants were guilty, if the jury found that they organized and supported the Party for the purpose, among others, of spreading the doctrine of violent revolution, that purpose to be realized as soon as it was feasible.

## II. The Challenge to the Array

The next question concerns the challenge to the "array" which we mentioned at the outset, and upon which the defendants conceeddly had the burden of proof. Their position is—to quote from their brief—"that none of the jury lists, panels and arrays * * * is, or for a long period of time has been, representative of a cross-section of the community, but has been representative only of the upper economic and social groups." They do not assert that jury lists must "give representation, proportional or otherwise, to every economic" group, but they do assert "that there was, on the one hand, systematic and gross discrimination against and limitation of the excluded groups * * * and on the other hand, systematic and gross favoritism towards and intentional inclusion of the rich, the propertied and the well-to-do strata of the community." We assume for argument that if the jury list—that is, the list from which separate panels are drawn—was unlawful, any separate panel based upon that list was unlawful, though taken by itself it was unexceptionable. That is to say, we will assume that any party to a suit, civil or criminal, is entitled to have the particular panel which tries his case, drawn at random from a list which is not unlawfully weighted, and that he may complain even though he has not shown that the imbalance has prejudiced him. The question therefore becomes whether the grand panel and the petit panel which respectively found the indictment and tried the case, were drawn from an unlawful list. The list contained those names which had been carried over from the past to which were added in 1947 and 1948 new names, culled out of some 25,000 notices sent out during those years. The practice of the clerk's office was for a deputy clerk, to whom the duty was assigned, either himself, or through assistants who acted under his direction, to prepare the list, confined substantially to the Boroughs of Manhattan and the Bronx with a sprinkling from Westchester and the other northern counties. The challenge is, not only to the sources from which he sent out notices to prospective jurors, but also that he unlawfully selected those whom he preferred from among those who appeared in answer to the notices and were in fact qualified. There is not enough evidence of this last challenge to demand discussion, and we shall confine ourselves to the first. It does not appear what proportion of those notified appeared, but it must have been small, for, after those who did appear, but failed to qualify were excluded, there remained only fifteen to twenty per cent— roughly one-sixth. In order to "qualify" a juror, the deputy required him to swear to a "questionnaire" stating his name, address, place and date of birth, education, employment and employer and other de-

tails. When "qualified" the name was put on the list, and a card was made out, and added to those from which the clerk and the commissioner drew panels as they were needed.

The Federal Grand Jury Association, as its name implies, was a voluntary association of present or former grand jurors in the Southern District. Beginning with the year 1938 and until some time in 1941 it prepared lists of prospective jurors, compiled by its officers from the following sources: Who's Who in New York, Who's Who in Engineering, The Social Register, volunteers recommended by the Association, the alumni directories of Princeton, Columbia, Harvard, Yale and Dartmouth, Poor's Register of Executives, and the Directory of Directors. The lists so prepared it submitted to the clerk and deputy clerk, who until May, 1942, used them as the principal source of persons to be notified. The total number of names so submitted by the Association through May 1942, was 16,277. The record contains no figures as to what was the condition of the list in 1938, except the testimony of the Chief Judge of the District that it contained an inordinate number of people on relief. In January, 1942, the Supreme Court decided the case of Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, in which Murphy, J., said: "deliberate selection of jurors from the membership of particular private organizations definitely does not conform" to the requirements of "a cross-section of the community". 315 U.S. at page 86, 62 S.Ct. at page 472, 86 L.Ed. 680. Whether or not because of this, after May, 1942, the Grand Jury Association prepared and sent no lists except 2,014 up to April, 1943, of which 514 were those of women volunteers, Negroes and other undistributed persons. After April, 1943, it sent only 121 names through the next five years. Therefore, even though we count all these as improperly used, the jurors who qualified out of them were presumably not more than 350, too little to deserve notice.

▇▇▇▇▇▇ A new deputy clerk was appointed in 1940 and from him we know that in July, 1941, the list contained about 10,-

000 names, of whom about 8,000 were petit jurors, and 2,000 were grand jurors. It was about the same size in 1942; but between 1940 and July, 1942, the Association had sent about 12,500 names to the clerk, out of which there were presumably entered upon the list say 2,000 new names, though the judge found that 1,900 names in all had been added between July, 1941, and July, 1942. From July, 1942, to April, 1943, the clerk notified nearly 12,000 persons taken from the voting lists, and 5,000 taken from the Association and volunteers. From the voting lists presumably he secured about 2,000 jurors, and from the Association 800 or more. Again in 1945 and 1946 he added about 2,500 more; so that at the end of that year, except for wastage, the list should have contained between sixteen and seventeen thousand names. In fact the number was about 13,000, and at the end of that year the clerk conducted a sort of purge, called an "inventory," which was designed to strike out those who had ceased to be qualified for one reason or another. In 1947 and 1948, as we have said, he notified 25,000 new persons—22,000 from the voting lists—out of which again we are to assume that there resulted a little over 4,000 new qualified jurors. The list in 1948 was about 13,000 (apparently the additions once more only made up for the losses caused by the "inventory"). It is of course impossible to say how many of the names originally sent to the clerk by the Jury Association remained upon that list. As we have seen, even though we do not allow for wastage they were presumably no more than a sixth of 18,000, or about 3,000 out of 13,000. The wastage over eight years must have been substantial, although we can do no more than guess what it was. Since the defendants have the burden, we shall do no injustice if we assume that no more than 3,000 of the 13,000, as the list stood in 1948, had been suggested by the Association. The clerk was free to call all these persons if he wished; he had no reason to reject them; at most his only mistake was that he allowed others to suggest them to him; and, as we shall show, that was not unlawful, for he was free to go to any source for persons to call. The only

question is whether they so weighted the list as a whole as to make it an improper source for the panels drawn in the case at bar. Glasser v. United States, supra, did not condemn the practice of accepting suggestions from groups such as the Association; what it did condemn was calling from any one group—women in that case—members of a single association only. We do not forget that of the grand jurors in the 70 panels examined by the defendants, 38 per cent of all who served, had been suggested by the Association.

The most that could be inferred is that there may have been a disposition to favor Association members as grand jurors while they continued upon the list. In conclusion we hold that, even though we were to concede that a list would have been invalid which was wholly made up by persons recommended by the Association, it was not proved that enough of those so recommended remained upon the list in 1948 to invalidate it as a whole.

The defendants next challenge the list because of the use made by the deputy clerks of the voting lists after the middle of 1942. With great detail and labor they prepared a series of charts designed to prove that the clerks must have deliberately selected from the voting lists those who came from the wealthier districts of the City in preference to those who came from the poorer. The clerks themselves categorically denied this, and the judge believed them and made a number of findings that they had not had any such purpose; but the defendants answer that the distribution which actually resulted so contradicts the testimony that the findings are "clearly erroneous." This argument is drawn not only from the 70 grand jury panels, which we have just mentioned, but from 28 petit jury panels, taken more or less at random. The defendants say that the large disproportion of jurors on these panels coming from the wealthier districts of the City, presupposes a similar proportion among those called, and that this could not have been the result of accident, and proves that the clerks preferred the wealthier districts because they wished to pad the list with wealthier jurors. We may say at the outset that it is to the last degree improbable that the clerks themselves should have had any preference for wealthy jurors; the only rational assumption is that the judges had directed them so to weight the list, which the Chief Judge of the district, who had charge of the matter, flatly denied. The defendants make an additional argument based upon classification of the jurors on the same panels by their occupations; but all such classifications are inevitably arbitrary and these incidentally do not conform to the Census. This kind of reasoning the Supreme Court refused to accept in Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043; and in any event, whatever can be inferred from it would add nothing to the argument drawn from the distribution by districts. We shall therefore confine our consideration to the territorial charts. These were themselves shown to be far from immune from attack in their origin and in detail. They were prepared by two witnesses, Wilkerson and Rodman, who supervised the work of a number of assistants, none of whom were called as witnesses; and the charts were therefore not competent as original documents. However, since they were used only as argumentative compilations from the panels which showed the jurors' addresses and had been put in evidence, it was proper to use them. Concededly all contained errors, and the judge discredited the accuracy, if not the good faith, of both Wilkerson and Rodman. Although, as we have said, the 28 panels of petit jurors were chosen at random, the sample territorial charts were drawn from only thirteen of these. The first six were indeed taken alternately; but the record does not show how the other seven were chosen; for all that appears they may have been deliberately selected because of their especial fitness to prove the defendants' contention. Moreover, quite aside from these infirmities, there are good reasons for believing that the panels were not a trustworthy basis for learning the composition of the lists of persons to whom notices were

219

sent. A large, though uncertain, percentage of those called never appear at all; as we have said already, only fifteen to twenty per cent of those called qualify, and the record does not show how large a part of this deficit is made up of those who do not appear. It may be a very large part, and it is so costly and troublesome to proceed against the defaulters, that the clerk merely calls others in their place. It would be an unproved assumption that the proportion of defaulters is the same among the poorer groups as among the wealthier; and indeed there is perhaps some reason for thinking that it may be considerably greater; not indeed because the wealthier groups have a higher sense of civic duty, but because they may think themselves more subject to pursuit. Be that as it may, the Census shows that less than one-half the urban population lives in the same quarters for seven years, and again it was not proved that this mobility was not greater among the poor than among the wealthier. Besides, a well-to-do person is more likely to leave a forwarding address than is a poor one, and so to receive a notice directed to his past residence.

Again, it was not proved that the clerk did not excuse a larger percentage of the poorer persons notified who did appear. Jury duty is a burden to all who serve except to the relatively few who are not gainfully employed and have leisure—such as retired business men, housewives whose children have grown up, and those who welcome any break in the monotony of their lives. But the hardship which it imposes upon a manual worker, especially now that the cost of living has so much increased, is much greater than that upon "executives" for example, who, ordinarily without serious disarrangement, can be made to serve at specified months. But all times are equally inconvenient to one who must work by the day, week or month to support a family, or even himself alone. No one who has not been charged with the duty of excusing such persons knows how strong such an appeal can be. This factor alone may have accounted for a wide difference between the proportion of those notified and those who "qualified." That such excuses

are illegal Thiel v. Southern Pacific Company, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, 166 A.L.R. 1412, did not decide. The jury clerk had there systematically refused to call any who worked for a daily wage. True, his excuse was that he had found that the judges uniformly excused all such when they were drawn for a panel; but what vitiated the list was the completeness of the exclusion, and the foolishness of the line between daily, weekly or monthly workers. The majority were careful so to limit the decision; saying 328 U.S. on page 224, 66 S.Ct. 984, 987, 90 L.Ed. 1181, "It is clear that a federal judge would be justified in excusing a daily wage earner for whom jury service would entail an undue financial hardship," and quoting with approval the remarks of Judge Knox before the House Committee of the Judiciary that "to require them to do so" (to serve) "is nothing less than the imposition upon them of extreme hardship". 328 U.S. at page 224, 66 S.Ct. at page 987, 90 L.Ed. 1181. "Only when the financial embarrassment is such as to impose a real burden and hardship does a valid excuse of this nature appear. Thus a blanket exclusion of all daily wage earners, however well-intentioned and however justified by prior actions of trial judges, must be counted among those tendencies which undermine and weaken the institution of jury trial". 328 U.S. at page 224, 66 S.Ct. at page 987, 90 L.Ed. 1181. Finally 328 U.S. at page 223, 66 S.Ct. at page 987, 90 L.Ed. 1181: "the pay period of a particular individual is completely irrelevant to his eligibility and capacity to serve as a juror." Whether any such power was properly lodged in the deputy clerks is another matter; even though we are to concede that it was not, it would not prove that they had deliberately chosen wealthier jurors and discarded poorer ones. Therefore this too might have accounted for a large part of the disparity between the panels who served and a roster of those called, if we had one.

However, after making allowance both for the discovered errors in the charts, and for the unanswered possible disparities we have just discussed, it appears to us that it would not be candid to say that these would

account for the territorial distribution of the panels analyzed in the charts. If notices were sent out upon the basis of the voting lists alone without any principle of selection, they would not, we think, have resulted in such panels as those. It does not, however, follow from that that the clerks adopted a principle of selection from the voting lists which was unlawful. The proper answer to this demands some inquiry into how a list of jurors may be lawfully prepared. In England, from which we inherited and adopted the jury, from the earliest times there had been a property qualification for jurors, which was repeatedly increased by statute with the successive falls in the value of money. A juror might always be challenged "per defectem," and "the principal deficiency is defect of estate sufficient to qualify him to be a juror." [12] During the reign of George II this qualification was fixed as a term of not less than 500 years, or as a freehold, in either case of the value of £20 per annum, and so apparently it stood in 1789. That was probably an estate worth as much today as $300 or $400 a year, and must have eliminated a very large proportion indeed of the population. Section 29 of the original Judiciary Act of 1789 [13] provided that the qualifications of jurors in federal courts should be the same as those of jurors in the highest courts of the state where the case was tried; and in the State of New York, at least as early as 1813, this required a freehold of the value of $150 or personal property of like amount; [14] which was raised in 1830 to $250 for personal property, [15] where it has since remained. That of course excluded a larger proportion of the community in 1813 and 1830 than it does today; it was presumably a substantial economic qualification; and it still disqualifies an appreciable number of persons. That Congress is still willing to allow property qualifications is apparent from the fact that the last recension of the Judiciary Act [16] makes it one

of the qualifications of a juror that he shall not be "incompetent to serve as a grand or petit juror by the law of the State." Although this qualification is not here a direct issue, we submit that its continued existence shows that the theory that a jury must be a "cross-section" of the community must be taken with some reserves.

In addition to this financial qualification, the New York statute applying to the City, requires that a juror shall be "intelligent; of sound mind and good character; well-informed"; [17] and in the northern counties of the District the language is "of fair character; of approved integrity; of sound judgment; and well informed." [18] These are by no means formal requirements; they show that jurors are not to be accepted at random from the voting lists or any other indifferent documents; that they are to be deliberately chosen on the basis of qualities which are assumed not to be the uniform possession of all citizens. Here too they do not constitute a "cross-section" of the community in the sense that a purely aleatory selection would be. The statute presupposes some winnowing of those called; and the first question is who shall make it. Section 29 of the first Judiciary Act also prescribed the same procedure for securing juries that then existed in England: "writs of venire facias when directed by the court shall issue from the clerk's office, and shall be served and returned by the marshal in his proper person, or by his deputy." How the sheriff should select those whose names he returned was not provided in England, or here, although there was a "challenge to the array," either because of the "partiality" of the sheriff; or because he "arrays the panel at the nomination or under the direction of either party"; or because the jurors were not from the vicinage. [19] United States v. Murphy, D.C., 224 Fed. 554, was a challenge on the second ground: the jury commissioner had accepted a list made up by an

12. Blackstone, Vol. II, Book III, p. 362.

13. 1 St. at L., p. 88.

14. § IX, Chapter IV, 36th Session N. Y. Legislature.

15. 2 N.Y.Rev.St., p. 411, § 13.

16. § 1861(4), Title 28, U.S.C.A.

17. § 596, N. Y. Judiciary Law, McK.Consol.Laws, c. 30.

18. § 502, N. Y. Judiciary Law.

19. Blackstone, Vol. II, Book III, p. 359.

assistant district attorney in a criminal prosecution. On the other hand, in 1821 the Court of Kings Bench could say in King v. Edmonds, 4 Barn. & Ald. 471, 484: "The first ground was, that the officer selected the names and did not take them by some mode of chance or hazard. Now such a mode would be contrary to all precedent and example. Jurymen have always been named by the discretion of some person: of the sheriff, the coroners, or elizors." Until its last revision the Judiciary Act continued in *ipsissimis verbis* to provide [20] for a *venire facias,* and indeed the substance of this is still preserved.[21]

Apparently, the practice has long since disappeared of leaving it to the sheriff or the marshal to exercise the discretion which he originally had. For example, in New York County since 1942 the county clerk must prepare "a jury list" from a number of specified documents, "and any other available sources,"[22] and before putting anyone's name on it, the clerk must examine the prospective juror for eligibility, who must swear to his qualifications.[23] These provisions are not incorporated into the Judiciary Act,[24] and, read literally, the clerk, when he issued the "venire," would still leave to the marshal the choice of making up the list of those whom he "returned"; and it would be only when the person so returned appeared that the duties of the clerk and the commissioner would begin: *i. e.,* to draw the names from the box.[25] We do not of course mean that the discretion formerly vested in the marshal he still retains, or that it is improper for the clerk to give him a list of names whom he is to call for a preliminary examination, but we do mean that the discretion, which the sheriff and the marshal originally had, has now by custom devolved upon the clerk; and that he may exercise it as the clerk does in the Southern District, following if he will, though he is not bound by, the practice prescribed for the County Clerk of New York County under the state law.

With this in mind, it does not seem to us that the defendants have proved that the list was prepared with any desire impermissibly to overbalance it with wealthier jurors. The standards they were called upon to apply were vague, it is true; but they were not impossible of approximate application, and some of them in any event refer, not alone to the personal qualities of the individual, but also to what is known of him by others. Thus a man unacquainted with others may have "integrity," but hardly an "approved integrity"; such a man may have an unimpeachable "character," yet not a "fair character"—at least it is permissible so to understand the phrase. In trying to obtain a list of those who would upon examination turn out to be qualified it was permissible to assume that persons in the preferred districts were more likely to be known to others and that these qualities would be more readily ascertainable than those in the districts not preferred. That may not be true in fact, but it does not seem to us to presuppose that the selection resulted only from a predilection for wealthier jurors. What we have said applies even more to the qualification of being "well-informed." It is entirely reasonable to assume that the leisure which comes with relative affluence is likely to result in a larger store of general information than is possible for one to acquire who must work for his daily living.

That this is a legitimate view to take seems to us to follow from Fay v. People of State of New York, supra.[26] As we have said, the majority there refused to be convinced by disparities quite as striking as those in the defendants' charts or in their tables of occupations; and thought the inferences to be drawn from such occupational divisions too hazardous to be relied upon. But they also went further, for they held

20. § 416, Title 28, U.S.C.

21. § 1867, Title 28 U.S.C.A.

22. § 594, N. Y. Judiciary Law.

23. § 595, N. Y. Judiciary Law.

24. Chapter 121, Title 28 U.S.C.A.

25. § 1864, Title 28 U.S.C.A.

26. 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043.

that, even though they had been reliable, it would not have followed that those who made up the "blue ribbon" list had done so unlawfully. On the contrary, they held that the disproportions proved might have resulted from an honest application of a "literacy test" which was more discriminatory than anything shown here. Disparity did not prove unlawful discrimination, they said, unless it also appeared that "the application of the proper jury standards would affect all occupations alike. * * * The percentage of persons employed or seeking employment in each occupation does not establish even an approximate ratio for those of each occupation that should appear in a fairly selected jury panel". 332 U.S. at page 276, 67 S.Ct. at page 1622, 91 L.Ed. 2043. That "a fairly selected jury" might be one subjected to an intelligence test the majority very clearly held; as appeared from the following: "All were subjected to the same tests of intelligence, citizenship and understanding of English. The state's right to apply these tests is not open to doubt even though they disqualify, especially in the conditions that prevail in New York, a disproportionate number of manual workers. A fair application of literacy, intelligence and other tests would hardly act with proportional equality on all levels of life. The most that the evidence does is to raise, rather than answer, the question whether there was an unlawful disproportionate representation of lower income groups on the special jury". 332 U.S. at page 291, 67 S.Ct. at page 1629, 91 L.Ed. 2043. That it was precisely on this score that the minority dissented, is plain, for they protested that the test presupposed that constitutionally a jury need not be a "cross-section" of the community: that is, a random selection not weighted by any superiority of "intelligence" or information.

It is of course true that the case concerned only the constitutionality of a state statute challenged under the Fourteenth Amendment, and that, as the Court itself observed, it had a more limited supervision in such cases than it has over causes originating in a federal court. It is also true that the jury was selected by personal examination of the individuals while here the clerks attempted a selection in advance and in bulk; but that makes no difference so far as concerns any denial of equal protection of the laws, or of due process of law, based on discrimination in the selection of names. The decision certainly answers any complaint on that score. If a suitor in a state court is denied neither equal protection nor due process, because the list, from which the jury which tries him is drawn, is composed disproportionately of wealthier persons, a suitor in a federal court is in no better position. The words have the same meaning in the Fifth and the Fourteenth Amendments, and the Court is no more solicitous to protect one than the other. It is true that the state courts may not be bound to try crimes by jury, as the Sixth Amendment binds federal courts; and, even where they are, any violation of their own constitution would not present a federal question. However, we have in substance already answered any possible question drawn from the Sixth Amendment as such. It has been decided over and over again that by it we incorporated the institution as we inherited it, and we have shown that the composition of the list did not diverge from what had been the accepted practice, save that for the sheriff's discretion the clerk's was substituted.

There is another possibility which may account for some of the assumed imbalance of the list: it is the same as that which we have already discussed in holding that the panels are not a good reflection of those who responded to the notices. The clerks may have deliberately reduced the proportion of those whom they reasonably expected the judges would excuse on the score of hardship. Or they may have been influenced by such declarations as were made to them when they asked for a list from the American Federation of Labor: i. e., "their people wanted nothing to do with juries." For example, it would obviously have been unreasonable to put on the list the names of those who were exempt on the chance that they might not claim exemption; yet all the exempt classes are "qualified." We can see no reason why the clerks should not recognize in advance that there were groups which were poor risks, as it were: i. e.

whom the judges would not hold. That would not justify their entire exclusion and they were not entirely excluded; moreover, more than a mere token representation was given them. But we are assuming that they were not proportionately represented, and, as we have already said, we see nothing in Thiel v. Southern Pacific Co., supra,[27] which made that course unlawful.

Nothing need be added, regarding the asserted discrimination against Negroes. So far as they were not represented on the list in proportion to their numbers, there is no evidence that it was on account of their race; and the disproportion is adequately explained by the fact that they are among the poorer groups. The argument drawn from the presence of the letter, "C," on their cards is without basis; it is understandable why the clerks should wish to know how many Negroes were on the list. The very fact that the Supreme Court had several times decided that they must be represented was occasion enough; any clerk would wish to avoid any color of a charge that he had discriminated against them. Had the list been drawn up for this particular prosecution, there might be some plausibility in finding a motive for keeping down the possibilities of Negroes on the jury, so great have been the wrongs done that race; but only a jaundiced mind can suppose that a public official in New York, having no personal stake in the event, would hazard the risk of detection for the sake of venting his bias against the race generally.

The other decisions on which the defendants rely are readily shown not to be relevant. First are those touching the exclusion of Negroes from juries. In 1879 the Court decided [28] that the total exclusion of Negroes from the array was a cause for reversal of the conviction. The Fourteenth Amendment had been passed especially to insure to that race the equal protection of the laws, and had given Congress power to implement that purpose by legislation, a power which Congress had exercised and with which the West Virginia statute was in conflict. There has never been any question since that time that this is the law; and it has been extended as well to the composition of the grand jury as to the petit. Moreover, the Court has had occasion several times to consider whether state laws, fair on their face, have been administered so as in effect to prevent or diminish the number of Negroes on panels.[29] It does not seem to us necessary to analyze the facts in these cases, for the upshot of them all was that the Court deemed itself bound to examine the evidence and decide for itself whether the jury commissioners had directly or indirectly tried to exclude Negroes or to hold them to some fixed minimum. It has at times inferred this from the difference between the proportion of the races in the population and the proportion upon the juries; it has refused to accept as an excuse that the commissioners put on the lists only persons with whom they were acquainted, and that they were acquainted only with white men; it has refused to accept a mere token representation of Negroes if satisfied that a selection made without bias might have resulted in a larger number. But in all cases it has used any disproportion only as evidence of a deliberate purpose to discriminate, and it has been at pains to disclaim the necessity of proportional representation as an end in itself. In short, it has always endeavored to learn whether the law has been administered in fact as it reads, or whether what was done was a cover for evading it. Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181, is as beside the case at bar as the decisions we have just mentioned. All women were excluded; there was no attempt to execute the law as it was written; in this respect

27. 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, 166 A.L.R. 1412.

28. Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664.

29. Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Hill v. State of Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L. Ed. 1559; Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629.

it is in accord with Glasser v. United States, supra,[30] where although women were put on the list, they were confined to members of the League of Women Voters: a patent refusal to apply the law uniformly. Finally, in International Longshoremen's and Warehousemen's Union v. Ackerman, D.C., 82 F.Supp. 65, the court found that the purpose of the commissioners was to exclude all Filipinos whatever from juries.

■ It is perhaps in order to say a word about the phrase itself—"cross-section,"—because the defendants so much rely upon it. It means a fair sample; and a sample drawn at random from the whole community will of course represent the distribution of wealth in the community as a whole, as it would represent the distribution of age, height, predisposition to sclerosis, or any other characteristic; but nobody contends that the list must be a sample of the whole community. Minors and the aged are excluded, as are the infirm and those of unsound mind, and practically so are all the exempt; a sample at random with any of those included would be different from that which concededly the law may and does prescribe. It is therefore idle to talk of the justness of a sample, until one knows what is the composition of the group which it is to represent. As we have seen, not only does the law exclude the groups we have just mentioned, but it excludes those who do not satisfy the very modest financial minimum still retained; and those also who cannot pass an examination as to the other prescribed qualities—intelligence, character and general information. The clerks attempted to apply these standards roughly by territorial discrimination, to which the defendants object that even though used in good faith, it resulted in weighting the list with the wealthy. There cannot of course be any doubt that the resulting sample is different from what it would have been, had the clerk sent out notices to all districts, based on their population, thus abandoning any effort to make any selection in advance. Moreover, we shall accept it as true, as it probably is, that the distribution of wealth

in such a list would have been markedly different from the list actually made. There is nothing wrong in the method as such, unless the law insists that all exclusions must represent the same proportionate distribution of wealth that would exist without them, in answer to which we can only repeat what we have just said. Certainly it is not our province to write a gloss upon a text, so long accredited; if that is to be done, the Supreme Court must do it. We can as yet find no authority in its decisions for holding that an honest application of the traditional standards violates the Fifth and Sixth Amendments, however it results. Nor do we think that we should imply such an authority from the repetition of the phrase on which the defendants rely. Since we do not find adequate evidence that the judge's findings were "clearly erroneous," which held that the defendants had not discharged the burden of showing that those standards had not been honestly applied, it follows that the list from which the grand and petit juries were drawn was not unlawfully made up.

### III. The Conduct of the Trial

■ The remaining questions concern the conduct of the trial; and the only important ones are six: the prosecution's use of the testimony of informers; the misconduct and bias of the trial judge throughout the trial; the denial of an impartial trial jury; errors in the admission of evidence; errors in its exclusion; and the denial to the defendant Davis of the privilege of summing up to the jury. Courts have countenanced the use of informers from time immemorial; in cases of conspiracy, or in other cases when the crime consists of preparing for another crime, it is usually necessary to rely upon them or upon accomplices because the criminals will almost certainly proceed covertly. Entrapment excluded, of which there was none here, decoys and other deception are always permissible.[31] Those decisions which, like Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647, hold that an entry

---

30. 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

31. Grimm v. United States, 156 U.S. 604, 610, 15 S.Ct. 470, 39 L.Ed. 550;

procured by fraud will not condone an unlawful search, depend upon the fact that the Fourth Amendment condemns "unreasonable searches." The "wire-tapping" cases depend upon a statute which expressly forbids the use of the proscribed information. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A. L.R. 376. "Artifice and stratagem may be employed to catch those engaged in criminal enterprises."[32] It is never "an absolute necessity" to caution the jury as to the use they may make of informers' testimony.[33]

░░░░░ The supposed misconduct and bias of the trial judge rest upon incidents, scattered throughout the record of nearly 13,000 pages of testimony and endless colloquy. True, it does not follow, because the attorneys misbehaved that the judge may not have done so too; indubitably the defendants were entitled to an impartial trial, regardless of any faults of those who represented them. Nevertheless, the question of their misbehavior and his misconduct cannot be entirely separated; and it is not irrelevant that this court decided that they so far exceeded the bounds of professional propriety as to deserve a sentence for criminal contempt; and, although there was a dissent, it rested upon procedural grounds, for the judge who wrote it spoke of the attorneys' conduct as "abominable." Early in the trial the judge ruled that the objection of one defendant might stand for all; yet the record is filled with repetitions by all, or most of, the attorneys of substantially the same arguments made by the first one; and these were repeated incessantly on later occasions after the point had been decided. All was done that could contribute to make impossible an orderly and speedy dispatch of the case; and whether this was, as the judge found, because of a deliberate and concerted effort to wear him down, there can be no doubt that such a concert would have been manifested in precisely the same form. The trial was punctuated over and over again with motions for a mistrial, often for patently frivolous reasons; by *innuendo,* and at times openly, the judge was charged with unfairness and "judicial misconduct"—often in most insulting language. Those occasions on which the defendants rely to show his intemperate hostility, so far as the record preserves what happened, are completely unconvincing. At times, it is true, he rebuked the attorneys; at times he used language short of requisite judicial gravity; at times he warned them that if they persisted in conducting themselves as they had been doing, he would punish them when the trial was over. (An entirely proper action, for to commit them pending the trial would have broken it up, and to be silent might well have misled them.) These cautions they answered most unwarrantably, as threats to prevent the discharge of their duties. Throughout, the judge kept repeating to the jury that they were not to take what he said to the attorneys against their clients; and, although we do not of course mean that that would have been enough to excuse him, had he in fact weighted the scales against them, none of the instances adduced give support for saying that he did; or that he denied them adequate opportunity to present their case. What he did do, was to attempt to keep the trial within measurable bounds; and in that he failed, because, and only because, the attorneys were obviously unwilling to accord him that cooperation which was his due, so far as it did not curtail their clients' rights. The length of the trial is itself almost an answer to that; the defense's case

---

Goode v. United States, 159 U.S. 663, 669, 16 S.Ct. 136, 40 L.Ed. 297; Rosen v. United States, 161 U.S. 29, 42, 16 S. Ct. 434, 480, 40 L.Ed. 606; Andrews v. United States, 162 U.S. 420, 423, 16 S. Ct. 798, 40 L.Ed. 1023; Price v. United States, 165 U.S. 311, 315, 17 S.Ct. 366, 41 L.Ed. 727; Smith v. United States, 8 Cir., 17 F.2d 723; United States v. Becker, 2 Cir., 62 F.2d 1007, 1009.

32. Sorrells v. United States, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413, 86 A.L.R. 249; Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322.

33. United States v. Becker, 2 Cir., 62 F. 2d 1007, 1009; United States v. Wilson, 2 Cir., 154 F.2d 802; Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann. Cas.1917B, 1168.

occupied nearly twice as much time as the prosecution's. Justice can be as readily destroyed by the flaccidity of the judge as by his tyranny; impartial trials need a firm hand as much as a constant determination to give each one his due. The record discloses a judge, sorely tried for many months of turmoil, constantly provoked by useless bickering, exposed to offensive slights and insults, harried with interminable repetition, who, if at times he did not conduct himself with the imperturbability of a Rhadamanthus, showed considerably greater self-control and forbearance than it is given to most judges to possess. So much for the charge of hectoring counsel and unduly limiting them in the presentation of their defense. As for any disposition in any other ways to lean towards the side of the prosecution, we cannot find it in the record; if it existed it must have been in tone or bearing which print does not preserve; for, as we shall show, his charges and his rulings were, if anything, too favorable to the defense.

▉▉ Next, it is urged that it was impossible in any event to get an impartial jury because of the heated public feeling against Communists. That such feeling did exist among many persons—probably a large majority—is indeed true; but there was no reason to suppose that it would subside by any delay which would not put off the trial indefinitely. The choice was between using the best means available to secure an impartial jury and letting the prosecution lapse. It was not as though the prejudice had been local, so that it could be cured by removal to another district; it was not as though it were temporary, so that there

was any reasonable hope that with a reasonable continuance it would fade. Indeed, as it turns out, it is probable that the trial was at a less unpropitious time than any that has succeeded it, or is likely to follow. Certainly we must spare no effort to secure an impartial panel; but those who may have in fact committed a crime cannot secure immunity because it is possible that the jurors who try them may not be exempt from the general feelings prevalent in the society in which they live; we must do as best we can with the means we have. In 1943 we denied a much more plausible argument of a kind not altogether dissimilar in United States v. Von Clemm, 2 Cir., 136 F.2d 968, 971: "Error is assigned to the court's refusal to postpone the trial until after termination of the war. The argument proceeds upon the assumption that evidence may be available in Germany which would be favorable to the accused if it could be found and produced. The recognition of such a doctrine would mean that every violator of our laws * * * would be immune from prosecution during time of war by merely asserting that witnesses abroad could prove his innocence of the charge."

▉▉ The next complaint is that the judge refused on the *voir dire* to put to the jurors specific questions, framed by the defense which were designed to learn whether they had any prejudice against Communists or the Communist Party. These questions, which we quote in the margin [34] were designed to supplement the questions put by the judge in more general terms, by which he sought to search the conscience of the jurors; and these also we quote in the

34. "Q.48: Do you believe that Communists are un-American or subversive?

"Q.49: Do you believe that a member of the Communist Party cannot be a loyal citizen of the United States?

"Q.51: Do you regard a Communist as a person who is unworthy of belief?

"Q.52: Are you in favor of legislation outlawing the Communist Party?

"Q.54: Are you in favor of excluding Communists from employment by state and Federal Governments?

"Q.56: Do you favor the exclusion of Communists from employment by private employers?

"Q.58: Do you believe the Communist Party to be the agent of a foreign power? (R. 13243)

"Q.61: Do you believe that the Communist Party teaches and advocates the overthrow and destruction of the Government of the United States by force and violence?

"Q.62: Do you believe that the Communist Party is a conspiracy for the overthrow and destruction of the Government of the United States by force and violence? (R. 13243)

"Q.73: Have you read or heard anything concerning this case? (R. 13244)"

margin.[35] The argument is that these were "compound" questions requiring too much analysis by the prospective juror to whom they were addressed, and not calculated to penetrate to the core of latent prejudices that he might subconsciously entertain. It is of course true that any examination on the *voir dire* is a clumsy and imperfect way of detecting suppressed emotional commitments to which all of us are to some extent subject, unconsciously or subconsciously. It is of the nature of our deepest antipathies that often we do not admit them even to ourselves; but when that is so, nothing but an examination, utterly impracticable in a courtroom, will disclose them, an examination extending at times for months, and even then unsuccessful. No such examination is required; indeed, it was exactly the purpose of Criminal Rule 24(a), which allows the judge to frame questions on the *voir dire* if he thinks best, to avoid the interminable examinations sometimes extending for weeks on end that had frequently resulted from the former method. If trial by jury is not to break down by its own weight, it is not feasible to probe more than the upper levels of a juror's mind. The judge's questions, although they included some verbiage, were clear enough, if the juror attended to their reading. They were indeed limited to the flat inquiry whether he was aware of any bias, but it is by no means unusual for a juror to admit as much, as anyone accustomed to jury trials knows. The defendants' questions, which the Rule gave them the privilege of submitting, were more specific and might have evoked answers that disclosed sentiments that on further probing might in turn have evoked prejudice which ought to have disqualified the juror; but by themselves they would not have done so. In other words they were useful only as preliminaries to a further detailed examination; and that might have unduly extended the *voir dire,* which, as it was, occupied eight court days. The Rule itself requires the court to submit only "such additional questions * * * as it deems

---

35. "Have you at any time been a member of, made contributions to or been associated in any way with business or religious organizations or organizations of any character in connection with the activities of which you have formed any opinions or impressions as to the merits of the charge unfavorable either to the Government or to the defendants or any of them which would prevent or hinder you from holding your mind fully open until all the evidence and the instructions of the Court are complete?" (R. 2758, 2881, 2914, 2935, 2963)

"Have you at any time been a member of, made contributions to, or been associated in any way with business or religious organizations, or organizations of any character, whose officers or representatives have made any expressions of advocacy of or friendliness toward Communists or Communism in general, on the one hand, or of opposition or hostility to Communists or Communism in general on the other hand, which expressions you have heard or read in any manner, which have led you to form any opinions or impressions as to the merits of the charge, unfavorable either to the Government or to the defendants, or any of them, which would prevent you or hinder you from holding your mind fully open until all the evidence and the instructions of the Court are complete?" (R. 2760, 2855, 2882, 2914, 2932, 2936)

"Has any juror such a bias or prejudice against the Administration or any agency of the United States, or against the defendants or Communists in general, or the Communist Party, whatever its aims and purposes may be, as would prevent him from reaching his verdict solely on the evidence presented in Court and the law as contained in the instructions and rulings of the Court?" (R. 2762, 2916, 2933, 2966, 2968)

"Have you any prejudice or bias for or against any defendant by reason of the race of the defendant which would prevent you from keeping your mind fully open until all the evidence and law are in?" (R. 2812, 2836)

"Would you * * * submit the testimony of such witness to the same scrutiny and test it by the same standards even if the defendant is a Communist?" (R. 2761)

"Would you be embarrassed in arriving at or rendering a verdict of not guilty in any way connected with your employment or by reason of your membership in or affiliation with any church, political party, club, society, or any other organization of any kind whatsoever, or in any other manner?"

proper"; and the conduct of the *voir dire* has always been within the discretion of the judge.[36] It is of course true that, like every other discretion, this one may be abused, and that it is then subject to review. Thus in Aldridge v. United States, 283 U. S. 308, 51 S.Ct. 470, 75 L.Ed. 1054, 73 A. L.R. 1203, where a Negro was on trial for murdering a white man, general inquiries as to prejudice were not enough; the jurors should have been asked as to race prejudice, as they were asked here, just as they were asked about any prejudice against Communists. Morford v. United States, 339 U.S. 258, 70 S.Ct. 586, was a very special situation. The trial came up in the District of Columbia and a number of the jurors were government employees. The accused wished to ask them whether the "Loyalty Order" would make them hesitate to render a verdict against the prosecution on a charge for refusing to deliver a document to the "Un-American Activities" Committee of the House; an order which required an examination by the heads of departments or agencies of all employees in order to discover "disloyal persons." Although the Court had held [37] that a government employee might sit on a jury where such a charge was involved, the accused was entitled to learn how far a juror might fear that a vote to acquit would imperil his job. Nothing of this sort was possible here. The excluded questions would at best have shown a possible provisional disposition, which is no different from a provisional opinion; and it is well settled that such an opinion does not disqualify a juror, if he believes that he can rid himself of it after he has heard the evidence.[38]

The challenges for cause to the six jurors, Walker, von Goeben, Ward, Schieck, Kerr, and Stern, were trivial; and their denial justifies no discussion. A more plausible objection arises over the refusal to withdraw the juror, Janney, or to examine the allegations in the affidavits which supported the defendants' motion to discharge him. These affidavits were of two kinds: those which alleged that before the trial began he had made a speech in Georgia during which he had said: "We are already fighting a war with Communism and it should be a fight to the death"; "We are in a war whether we think we are or not." Another, and much more extended, affidavit was of a woman, called Nathanson, who professed to have kept what she called "a diary," in which she recorded talks she had had with Janney during the trial. Even though the declarations just quoted from Janney's Georgia speech stood alone, they would not be enough to disqualify the juror under the rule we have mentioned, if he had said, as he did, that he could give the accused a fair trial. That "we" were in a "war" with Communists, which we should "fight to the death," was, no doubt, an expression of violent hostility; but, if the charge was, as in fact it was, that the defendants were engaged in a conspiracy to teach or advocate the overthrow of our government from within, it by no means followed that even he, who was so hostile to Communists, could not lay aside his general predispositions, when he was faced with the specific issue. Janney did testify that he was not conscious of any bias against the defendants, and that he had never expressed any "views as to" their "guilt"; and perhaps that alone would have been enough. However, had there been only that disclaimer, the Georgia speech would have caused us some hesitation. Strangely enough, the affidavit of Nathanson showed that Janney was acutely aware of the difference between the Communism to which he was so hostile, and the particular charge on which he was to pass; and that he would not let himself be di-

36. Connors v. United States, 158 U.S. 408, 413, 15 S.Ct. 951, 39 L.Ed. 1033; Assaid v. United States, 4 Cir., 10 F.2d 752; Brady v. United States, 9 Cir., 26 F.2d 400; United States v. Daily, 7 Cir., 139 F.2d 7, 9; United States v. Barra, 2 Cir., 149 F.2d 489; Fredrick v. United States, 9 Cir., 163 F.2d 536, 550.

37. Dennis v. United States, 339 U.S. 162, 169, 70 S.Ct. 519.

38. Reynolds v. United States, 98 U.S. 145, 155, 156, 25 L.Ed. 244; Holt v. United States, 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021, 20 Ann.Cas. 1138; American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, 118.

verted from deciding the charge, either by his hostility or the overwhelming *ennui* which he suffered during the prolonged trial.

 Janney was a novelist and producer and Nathanson was a "singer-actress"; she explained her repeated visits to Janney by the hope she had of a part in his new production. Her "diary" was not a diary at all; it was a minute report of what she had extracted from the garrulous Janney and even from his assistant in repeated interviews. We cannot be absolutely certain that she had been sent as an agent provocateur to draw him into talk which might disqualify him, but an impartial perusal of the supposed "diary"—especially of the original script—cannot fail to arouse much more than a suspicion that that was exactly what she was. Be that as it may, if she was sent on any such errand, she was hoist with her own petard, for she furnished the most satisfactory evidence that Janney was fit to sit on the panel. It is true that he disregarded the injunctions of the judge, and talked about the trial as he should not. More than that, he expressed in violent terms his weariness at the interminable talk and the documents about "Marxism-Leninism"; he would "crown," he would "kick," anyone who ever brought up that subject again. That we can readily understand; but the important thing, as we have said, is the clear distinction he made between Communists and Communism generally, and the issue which he had to decide. We quote the following passages: "The Communists here can't plot and teach force and violence—of course that's the charge—whether they do or not, we will have to decide, when the trial is over—this decision will be up to us—or it may not even get to us." Again: "The Communists are charged with plotting to overthrow the government. Of course, they say they don't. The Government says they do." Again: "We have a very fair jury. They are calm—they won't be swayed or prejudiced by personal emotion. It isn't whether we like Communists or not—just is this charge true or isn't it."

Finally: "I always tell people that the Communist Party is not on trial—only eleven individuals." We hold that the judge acted within the bounds of his discretion, when he refused to discharge this juror.

 Next as to evidence alleged to have been erroneously admitted: first, as to the testimony of the witness, Budenz, who had been a Communist in good standing, the managing editor of the party paper, the Daily Worker, but who had become an apostate. His testimony was of two kinds: he swore to the meaning of such terms as "Marxism-Leninism," "revisionism," "opportunistic error," "exceptionalism" and other similar terms which constantly recur in Communist writings. Some of these are coined words, some are words used in another than their colloquial meaning; but all have, as he testified, an accepted conventional meaning among members of the Party. He was as well qualified as an expert to know what that meaning was as anyone could be; and we cannot see any more reason to exclude his testimony than to exclude the evidence of any other parts of the mutual understandings of the defendants. As for the rule against conclusions, it is at most only one of convenience,[39] and in this case every consideration of convenience made against its imposition. Budenz's other testimony was that there were certain passages in the Communist Constitution, which were innocent upon their face, but which were understood by the initiate to be only a cover—"window-dressing"—for the violent methods advocated and taught. This was so patently competent testimony that it needs no discussion. As to the admission of documents, the judge allowed the prosecution to put in evidence such passages as he thought relevant to support the charge; but he allowed the defense to put in only those other passages which contradicted, modified, or otherwise threw any light upon the prosecution's passages. The defendants insist that either the whole document, or no part of it, was competent. There is no such rule; on the contrary

39. Central R. R. of New Jersey v. Monahan, 2 Cir., 11 F.2d 212; United States v. Cotter, 2 Cir., 60 F.2d 689, 693, 694.

230

it is well settled that only those parts of a document which throw light upon the parts already admitted become competent upon its introduction.[40] The question is again one of discretion, and the defendants have not shown that what was excluded was competent under this rule.

The objection to the admission of three especial documents requires no answer; and the only remaining question is the admission of declarations either of teachers of the "principles of Marxism-Leninism" to their pupils, or of members of the Party or of the National Committee to pupils or to someone seeking admission to the Party, or at public meetings designed to secure members or to encourage the faithful. In this circuit we have repeatedly stated that such declarations are competent against the accused in a prosecution for conspiracy, or for any other concerted venture, when, but only when, they are made in execution of an enterprise— "a partnership in crime"—to which the accused and the declarant are both parties, and that the enterprise must itself comprise making some such declaration as a step in its realization.[41] All the defendants had at one time or another been members of the National Committee, which is the executive organ of the Party elected by the National Convention; all had also been members of the National Board, a smaller body in which authority was vested between meetings of the Committee. All had been affiliated with the Party in other capacities for many years; some had even been to Moscow to absorb the teachings of the Russian Party. Obviously, no reasonable person can doubt that they were aware of the teachings and advocacies which are spread throughout the authoritative texts, and that these were used to indoctrinate pupils. A colloquy which arose in a class between a teacher and a pupil, or the address of a speaker at a public meeting of the Party, were therefore declarations made in execution of the common enterprise, and they fell directly within the general rule and were plainly competent. This accounts for all the declarations cited in the brief which were admitted, except that of Mrs. Cane, to whom the informer, Hidalgo, was referred when he wished to join the Party. Since she was a member of the executive body of a club in New York, it was reasonable to infer, both that she was acquainted with the Party doctrines, and that what she said was in execution of the Party purposes; and her declarations constituted no exception to the rule.

All these declarations the judge left to the jury with the following instruction: "Before you could consider this evidence against the defendants, or any of them, you would have to be convinced beyond a reasonable doubt that the instructor in question was a member of the conspiracy with knowledge of its aims and purposes, and that the teaching in question was during the period of the indictment and in furtherance of the aims and purposes of the conspiracy. * * * If you are convinced beyond a reasonable doubt that one or more of the defendants knowingly were parties to such conspiracy, you may consider the acts and statements of co-conspirators engaged in the same enterprise and done or said in furtherance of the conspiracy and in the time specified in the indictment, just as though such statements and acts were said and done by the defendant or defendants who were found by you to be members of the conspiracy." It is not clear in the books that these instructions did not too much confine the jurors' use of the declarations, for it directed them not to regard them at all unless they were first convinced beyond reasonable doubt that the declarant and the defendants were engaged in a common venture which the declarations helped to realize. It is difficult to see what value the declarations could have as proof of the conspiracy, if before using them the jury had to be satisfied that the declarant and the accused were engaged in the conspiracy charged;

40. Grobelny v. W. T. Cowan, Inc., 2 Cir., 151 F.2d 810; United States v. Corrigan, 2 Cir., 168 F.2d 641, 645.

41. United States v. Peoni, 2 Cir., 100 F.2d 401; United States v. Crimmins, 2 Cir., 123 F.2d 271; United States v. Cohen, 2 Cir., 145 F.2d 82, 90, 91.

for upon that hypothesis the declarations would merely serve to confirm what the jury had already decided. In strict logic these instructions in effect altogether withdrew the declarations from the jury, and it was idle to put them in at all. The law is indeed not wholly clear as to who must decide whether such a declaration may be used; but we think that the better doctrine is that the judge is always to decide, as concededly he generally must, any issues of fact on which the competence of evidence depends, and that, if he decides it to be competent, he is to leave it to the jury to use like any other evidence, without instructing them to consider it as proof only after they too have decided a preliminary issue which alone makes it competent. Indeed, it is a practical impossibility for laymen, and for that matter for most judges, to keep their minds in the isolated compartments that this requires. In United States v. Pugliese, 2 Cir., 153 F.2d 497, 500, the charge was against the husband and wife as joint possessors of illegal liquor; and the husband was convicted and the wife was acquitted. The question arose as to the competence of the wife's declaration against the husband, and we held that they were competent; yet obviously, if the jury used the declarations against the husband they must have done so without being satisfied beyond a doubt that she possessed the liquor in concert with him. Of course, they may have found the evidence against him enough without recourse to the declaration, but they were not so instructed. Instead we said: "The admissibility of the wife's declarations in the case at bar was for the judge, and the fact that the jury later acquitted her was irrelevant. The issue before him was altogether different from that before them: he had only to decide whether, if the jury chose to believe the witnesses, Pugliesi and his wife were engaged in a joint undertaking; they had to decide whether they believed the witnesses beyond a doubt." No doubt, this conclusion permits the jury to act upon hearsay, because they may be satisfied of the "joint undertaking" only because of the declaration; but it often happens that hearsay is competent, and this is the only practicable way to deal with the question.

■ Be that as it may, we need not decide the point, because, as we have said, the judge left the question to the jury, which the defendants asked him to do. In another regard he also favored them more than he need have. He charged the jury that they should use no declarations against any defendant, save those made by him himself, unless they were made within the period laid in the indictment. There can be no logical reason for limiting evidence to prove that the defendants were in a conspiracy between 1945 and 1948 to the period of the charge; if they were in the conspiracy earlier, declarations of any one of them or of any other person acting in concert with them are as competent as those made within the period laid. Whether they are relevant depends upon how far they form a rational support for believing that the conspiracy continued to 1945; but it is nonsense to say that events occurring before a crime, can have no relevance to the conclusion that the crime was committed; and declarations are no different from any other evidence. How far back of the commission of the crime one may go is a matter of degree, and within the general control of the judge over the relevancy of evidence. In the case at bar, there is not the least reason to hold that his discretion was abused. The same doctrine applies to evidence occurring before the acts charged had become a crime at all: e. g., in the case at bar the visits of some of the defendants to Moscow before 1940. Just as in the case of events occurring before the dates laid in the indictment, so events occurring before the conspiracy had become a crime, may have logical relevance to the conclusion that the conspiracy continued until after 1940. It is *toto coelo* a different question whether we are treating them as *media concludendi*, or as the factum itself. Kammann v. United States, 7 Cir., 259 F. 192, is not to the contrary; the declarations of the accused before we were at war were extremely remote to prove his intent after we entered the war. There might indeed be a faint basis for supposing that one who sided with the Germans

while we were neutral, would still side with them after we were enemies; but it was not surprising that the appellate court thought the inference too feeble to be within the trial court's discretion. However, in Wolf v. United States, 8 Cir., 259 F. 388, 393, although the report leaves it uncertain, apparently the declarations were made after we entered the war, and yet they were held to be improperly admitted; and in Haywood v. United States, 7 Cir., 268 F. 795, 806, there is a dictum to the same effect. We are not in accord with this reasoning; and it follows that we regard the admission of evidence of what any of the defendants did before the Smith Act was passed as competent and relevant. Indeed, it would have been equally so, had its use not been confined, as it was, to the individual defendants concerned: that is, it would have been, had the judge concluded, as well he might, that already all the defendants were engaged in the same enterprise that was charged against them in the indictment. The only question that could arise was whether the interlude of the Communist Political Association between May, 1944, and July, 1945, made what was done earlier too remote rationally. Clearly the interlude did not do so. We hold that all the declarations were competent and relevant.

▉▉▉ Next is the question of the evidence which the judge excluded. The most plausible of all the objections is to his refusal to allow the defendant Thompson to testify what he understood to be the meaning of the principles of Marxism-Leninism. That was in substance the same question which Budenz had been allowed to answer; and without more the ruling might indeed have unduly restricted Thompson's testimony, though it would scarcely have required a reversal. The purpose of the question was apparently to allow Thompson to deny that the innocent clauses in the Party's Constitution of 1945, to which the question referred, were intended to be a cover for the sinister purposes of the indictment: i. e., whether they were "Aesopian." Four of the other defendants, either before or after this ruling, denied that the language was so used, and

the force of Thompson's added denial would in any event have been extremely small. But that was not all. Later, Thompson managed in disregard of the judge's attempt to limit him, to go into a disquisition five pages long as to what he had told the Party's Board were the principles of Marxism-Leninism, in which recourse to violence did not appear; and he was later allowed to continue in the same vein for nine more pages. In the light of this to argue that he suffered from the ruling on the first question scarcely justifies the attention we have given it. The judge's exclusion of Davis's article was plainly right as to Davis; evidence of what he had said off the stand was obviously incompetent. So far as it was offered to show how the other defendants understood Marxism-Leninism, we will defer it for the time being. The last exclusion of this kind was of a question to Gates as to what was his understanding of the expression "converting the imperialist war into a civil war," which appeared in a pamphlet issued by the Party. Thompson later explained that this "slogan" had had its origin at the time of the seizure of power by the Communists in Russia in 1917; and Gates had himself in some measure already confirmed this by saying that the Party had never used it in any war in which the United States took part. With these explanations any damage that Gates might in theory have suffered from the ruling, if it were wrong, seems to us to be imaginary.

▉▉▉ The remaining objection to the exclusion of evidence may be summed up as a denial of the defendants' right to put in evidence documentary and other proof to show the great mass of publications, speeches and teaching in which force and violence were not taught or advocated. They concede that the judge admitted what they offered about the teaching in those schools in which the prosecution had sought to prove that violence had in fact been taught; but they argue that it was erroneous not to let them show the innocence of the teaching in other schools. Similarly, although large numbers of publications of the Party were put in evidence

which purported to declare the principles of "Marxism-Leninism," which everyone conceded was the orthodox creed, they protested against the denial of their right to add to these other publications which we will assume for argument, contained no advocacy of violence. Had these contained disclaimers of any resort to violence they would have been relevant, and certainly they were competent; but the defendants refer us to no passages containing any such disclaimers. True, they contained discussion of the lynching of Negroes as instances of the barbarity of the bourgeoisie, but nothing, so far as appears, to indicate that, contrary to those passages on which the prosecution relied, the doctrines which they advocated did not countenance resort to violence, but were to be brought about by constitutional methods. Thus, the question is whether, when the charge was of advocating or teaching a resort to violence, it is relevant to introduce evidence which, though it does not contradict the prosecution's evidence, does show that in a vast number of publications violence had not been taught or advocated. Had the charge depended upon how important a part of the defendants' propaganda was occupied with the advocacy of violence, such evidence might be relevant; but that was not the charge. It was of no moment to show how often they had left out this element of their teaching, when the issue was whether it was an element.

Only on one issue in the case could it be relevant. As we have said, the danger which might ensue from the advocacy and teaching of violence must be "present," by which we mean probable. It would be possible to argue that a great bulk of agitation which did not advocate violence might so cloak or obscure those parts which did, as to make any actual resort to violence too improbable to count. Even so, it was not necessary, and it was clearly most wearisome and confusing to pile in at random all publications of the Party. All that could be demanded was adequate samples of the innocent aspects of the agitation as a whole. The judge did admit a large number of publications, dilating upon the enormities practiced under capitalism, and arguments that these were inherent in that system. For example, he admitted 26 exhibits offered by the defendants which at least by their titles were of this kind; and which, we may be sure, did not contain any advocacy or teaching of violence. To say that he was obliged to admit all that they offered in a trial which had already swollen to unheard of length, is in essence to say that he had no power to decide when evidence, even logically relevant, may be excluded because it would add nothing of importance to elucidate the issue to be tried.

There remains the judge's refusal to allow the defendant Davis to sum up to the jury at the conclusion of the evidence. Davis had been represented during the whole trial by Mr. Sacher with great skill, loyalty and address; Davis had indicated not the slightest dissatisfaction with the manner in which Mr. Sacher had conducted himself; nor did he do so when he asked leave to substitute himself in addressing the jury. The judge took the motion under advisement and refused to allow the change; whereupon Davis decided that no one should sum up for him, although there is no reason to suppose that Mr. Sacher would not have done so, had he asked him to do so. The judge gave as his reason that Davis had repeatedly interfered with the conduct of the trial during its course, that he had not confined his testimony to the questions asked him, that he had three times taken part in "outbursts," and had been disorderly and contemptuous. He feared that to let him address the jury would be an opportunity again to resort to similar devices which would be hard to control.

Since Davis had for nine months been content with Mr. Sacher's representation of him and was wholly indefinite as to any reason for a sudden change, and since his interest could by no possibility conflict with those of Mr. Sacher's other clients, it is difficult to assign any other motive for his request than that he wished to make a flaming address to the jury which would have reverberations not only inside but outside the court room. He had no absolute and unconditional privilege to

dismiss the attorney whom he had originally retained and from whose conduct of the defense he never intimated the slightest dissent. True, one has an absolute privilege of doing without any attorney, if one wishes, but that is quite different from the privilege of discharging him without any substantial reason at the very conclusion of the case.

We have twice ruled that a defendant has no such absolute privilege;[42] and those were in cases where the request was made early in the prosecution, when there was more ground for allowing the substitution. In Glasser v. United States, supra,[43] the accused asserted that there was a possible conflict of interest which made it improper for the same attorney to represent both him and his co-defendant—a totally different situation. If the judge feared that the result would be, as he said, another of those "outbursts" which he had found it so hard to deal with, it appears to us that he was within his powers to confine Davis to the exceptionally capable protection of Mr. Sacher. To deprive a judge of that much control over such an issue would play into the hands of any accused who might seize the opportunity still further to confuse a trial, already much confounded.

This ends all that we think it necessary to say. We have not indeed dealt with all the objections and complaints put forward by the defendants in the 570 pages of their briefs; that would be impossible within any reasonable bounds. We have, however, answered as well as we can all those points which seem to us of any moment. The record discloses a trial fought with a persistence, an ingenuity and—we must add—with a perversity, such as we have rarely, if ever, encountered. It is of course possible that the defendants are inspired with the fanatical conviction that they are in possession of the only gospel which will redeem this sad Planet and bring on a Golden Age. If so, we need

not consider how far that would justify the endless strategems to which they resorted; and it is not for us to say whether such a prosecution makes against the movement or, on the contrary, only creates more disciples; ours is only to apply the law as we find it. Once the question is answered whether the Smith Act is valid, and whether there was evidence before the jury from which they might hold it violated, we can find no privilege and no right denied them which had substance. We know of no country where they would have been allowed any approach to the license here accorded them; and none, except Great Britain, where they would have had so fair a hearing. Their only plausible complaint is that that freedom of speech which they would be the first to destroy, has been denied them. We acknowledge that that freedom is not always easy to protect; and that there is no sharp line which marks its scope. We have tried to show that what these men taught and advocated is outside the zone; our Brother CHASE believes that we have enlarged it too much, and he argues his view with great persuasiveness. But we all agree that they have not brought themselves within its protection, and it is not a matter of great moment how far outside they are.

Convictions affirmed.

CHASE, Circuit Judge (concurring).

If this appeal involved the constitutionality of a statute outlawing appellants' party, I would not think this opinion necessary. For I agree with my brothers that the validity of a legislative restriction upon an exercise of the freedom of speech is not to be determined simply by the mechanical application of a legal formula or rule of thumb, whether or not expressed in terms of "clear and present danger." Rather, it is to be determined by weighing the competing, and in part conflicting, interests necessarily involved, including the nature and gravity of the evil meant to be avoided

---

42. United States v. Mitchell, 2 Cir., 137 F.2d 1006, 1010; Id., 2 Cir., 138 F.2d 831; United States v. Gutterman, 2 Cir., 147 F.2d 540, 157 A.L.R. 1221.

43. 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

by the restriction and the degree of likelihood that the evil will occur if the restriction be not imposed. But their view, as I understand it, is that the First Amendment protects expressions of belief, though not calls to forcible action; that, as interpreted by the Supreme Court, the Amendment protects those utterances that are at once expressions of belief and calls to action—at least when those utterances are as to "political" matters (though apparently not those utterances that concern educational matters); that it is tacitly assumed, the appellants' utterances prohibited by this statute were both expressions of belief and calls to action; and that, therefore, those utterances were of a type which might be an exercise of the freedom of speech. This view, I think, rests upon too broad an interpretation of the challenged Act and has resulted in giving insufficient effect to soundly decided cases that we are required to follow.

The Alien Registration Act, 1940,[1] Sections 2 and 3, commonly called the Smith Act, among other things, prohibits any person (1) from knowingly or wilfully advocating, abetting, advising or teaching the "duty, necessity, desirability, or propriety" of overthrowing any government in the United States by force or violence; (2) from helping to organize any society or group of persons who "teach, advocate, or encourage" such forcible overthrow; and (3) from conspiring to commit the acts prohibited as above. The trial court, as its charge shows, construed the Act to mean that an accused, to be found guilty, must be found to have taught or advocated *action* to accomplish overthrow, by language reasonably calculated to incite such action. This construction of the Act was, I think, demanded in view of, first, the similar interpretation of a statute prohibiting language advocating, advising or teaching overthrow by unlawful means in Gitlow v. People of State of New York, 268 U.S. 652, 664, 665, 45 S.Ct. 625, 69 L.Ed. 1138,—which statute, as Judge HAND says, must have been the "model" of the one at bar—and, second, the canon that statutes are to be construed so as to avoid constitutional difficulties, or, more particularly, in the case of legislation in the realm of civil liberties, to restrict those liberties least. Schneiderman v. United States, 320 U.S. 118, 158, 63 S.Ct. 1333, 87 L.Ed. 1796. Thus, as properly interpreted by the court below, the Smith Act does not prohibit prophecy that overthrow will occur or abstract discussion as to the value of revolutions, such as that engaged in by some of the Founding Fathers.[2] Nor does it impinge upon beliefs as to the necessity or desirability of the most extreme governmental and political changes, such as, for example, the abolition of the legislative and judicial branches of the government, or of the liberty of speech or of the press, or of the requirement that one's life, liberty or property may not be taken from him without due process of law. What it does prohibit is the urging of action to accomplish such changes as these by forcible means.[3] The effect of the statute upon beliefs is, therefore, a limited one only: it does not prohibit the holding of any belief; it prohibits only the expression of but one belief, *viz.*, that action should be taken to overthrow the government by force. While the prohibited expression is no doubt, in the broad sense, as to a "political" matter, Judge HAND refers to no case which holds it protected by the First Amendment.

On the contrary, in Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct.

---

1. 54 Stat. 670.

2. An illustration is Jefferson's "The tree of liberty must be refreshed from time to time, with the blood of patriots and tyrants." 4 Jefferson, Works (Ford ed.) 467.

3. The sufficiency of the evidence to support the conviction is clear. This included, besides the evidence mentioned by Judge HAND, proof that many of the Communist Party's activities directed by the appellants, were conducted secretly and that appellants followed a policy of concentrating party members in basic industries, all for the purpose of achieving their aims of overthrow, as well as evidence tending to show that the party itself was closely allied to and sympathetic with, and perhaps absolutely dominated by, a foreign government, the Soviet Union.

625, 69 L.Ed. 1138, the Supreme Court held "That utterances inciting to the overthrow of organized government by unlawful means, present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear." 268 U.S. at 669, 45 S.Ct. at page 631, 69 L.Ed. 1138. Said the Court: "Such utterances, by their very nature, involve danger to the public peace and to the security of the State. They threaten breaches of the peace and ultimate revolution. * * * The State cannot reasonably be required to measure the danger from every such utterance in the nice balance of a jeweler's scale. A single revolutionary spark may kindle a fire that, smouldering for a time, may burst into a sweeping and destructive conflagration. It cannot be said that the State is acting arbitrarily or unreasonably when in the exercise of its judgment as to the measures necessary to protect the public peace and safety, it seeks to extinguish the spark without waiting until it has enkindled the flame or blazed into the conflagration." *Ibid.* As was said in Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." I would but add to what was said in the Gitlow case that the utterances prohibited by the Act there construed and by the Smith Act are, like those just referred to, "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." 315 U.S. 572, 62 S.Ct. at page 769, 86 L. Ed. 1031. The benefit, if any, to be derived from language advocating action to overthrow is even more "clearly outweighed" by the interest in our national security and in the preservation of our hard-earned liberties and our republican form of government which protects them not only in theory but in fact. At least it is for the legislature, here the Congress, so to determine, once it reasonably finds that such advocacy presents such danger to the government.[4] That Congress could reasonably have found that it did so is plain: this statute was enacted shortly after the world became aware of what vast dangers lay in "Fifth Columns," so called —Norway was but one example. The Congressional judgment has, indeed, been confirmed, again and again, by events. Communism has by forcible overthrow engulfed or attempted to engulf nation after nation, after preparation for the use of force by just such advocacy as this Act forbids. As this is being written, Fifth Column activities are aiding the North Koreans in their war against the United Nations. Again, the President has just now warned all citizens and police officers to be watchful of spies, sabotage, and other subversive activities. The uncovering of a Communist spy ring in Canada[5] and the recent conviction of a British atomic scientist on charges of espionage are but further instances of proof, though none be needed, that the Congress was acting wisely, and most reasonably, when it enacted the statute at bar.

It is, I think, no answer to this that appellants urge political and economic changes, and there is great value in giving the fullest measure of protection to such speech. If this statute made it criminal to belong to the Communist Party, then that question might arise, and, as I have said, this opinion would not be necessary. The Act at bar, however, is not so broad, as I have attempted to show.

The only answer to the rule of the Gitlow case is, I believe, that individuals have

---

4. This is all that was meant when it was said in Herndon v. Lowry, 323 U.S. 242, 258, 57 S.Ct. 732, 739, 81 L.Ed. 1006, that "* * * the penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government."

5. See The Report of the Royal Commission (1946).

a constitutional right to revolt. Of this, the Constitution contains its own refutation. The Preamble; Art. I, Sec. 8; Art. III, Sec. 3; Art. IV, Sec. 4. History confirms this also. One need only refer to the so called· "Whiskey Rebellion" and the secession of the Confederate States.

That Gitlow v. People of State of New York was correctly decided and is controlling here seems, to me at least, abundantly clear. It has never been overruled. On the contrary, it was followed in Whitney v. People of State of California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095. It was approved in Stromberg v. People of State of California, 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484. See also Herndon v. Lowry, 301 U.S. 242, 256, 257, 258, 57 S.Ct. 732, 81 L.Ed. 1006; Bridges v. California, 314 U.S. 252, 260, 261, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Cardozo, J., dissenting in Herndon v. Georgia, 295 U.S. 441, 450, 451, 55 S.Ct. 794, 79 L.Ed. 1530. It is true that language from the dissenting opinions in the Gitlow and Whitney cases has frequently been referred to, though sometimes with disapproval. This is as it should be, for that language has sometimes been helpful in cases where the challenged statute prohibits, not specific utterances, but results which the utterances may ·tend to bring about. The Gitlow and Whitney cases remain good law. They are applicable here, and binding upon us. The principle they stand for is sound. I believe that they should be followed directly, and not merely by-passed.