466 So.2d 1152 (1985)
STATE of Florida, Petitioner,
v.
James Leroy WILSON and Nancy Pauline Wilson, Respondents.
No. 83-806.
District Court of Appeal of Florida, Second District.
March 27, 1985.
*1153 James T. Russell, State Atty., and C. Marie King, Asst. State Atty., Clearwater, for petitioner.
Alfred J. Ivie, Jr., Dade City, for respondent James Leroy Wilson.
Charlie Luckie, Jr. of Dayton, Sumner, Luckie & McKnight, P.A., Dade City, for respondent Nancy Pauline Wilson.
PER CURIAM.
The state has invoked our jurisdiction to review a pretrial order entered in this matter by the trial court foreclosing the use at trial of coconspiracy testimony which the state intended to offer in support of its prosecution of James Leroy Wilson and Nancy Pauline Wilson for the first degree murder of their daughter-in-law, Tina Wilson, and her unborn child. We note that although the state brings this case to us under Rule 9.140(c)(1)(b) of the Florida Rules of Appellate Procedure, the trial court's order is not appealable. Consistent with our practice, however, we treat this proceeding as if it were before us on a petition for writ of certiorari contemplated in Rule 9.100(c). We grant the petition and turn to the claim that the trial court departed from the essential requirements of law in finding that the state failed to present sufficient, independent evidence of a conspiracy, thus barring the testimony of the coconspirators.
It is axiomatic that independent evidence of a conspiracy must exist as an antecedent to the admissibility of coconspirator testimony otherwise inadmissible as hearsay. Damon v. State, 289 So.2d 720 (Fla. 1973). Equally indisputable is the requirement that before the hearsay testimony is permitted to be considered by the trier of the facts, independent evidence must exist disclosing the participation in the conspiracy of the party objecting to the hearsay. Id. at 722. A determination of the proper application of the coconspirator *1154 rule does not end, however, with consideration of the foregoing elements. There are two other aspects of the rule with which we must be concerned. One, of course, derives from our substantial adoption in State v. Morales, 460 So.2d 410 (Fla. 2d DCA 1984), of the relevant concepts developed in United States v. James, 590 F.2d 575 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). We announced in Morales that when confronted with the need to pass upon the state's purpose to introduce hearsay evidence through the testimony of coconspirators, trial courts are to measure the evidence of an existent conspiracy and the participation of defendants in it by a substantial evidence standard. Subsequently, we further stated, the trial court, in accordance with our approval of the Fourth District's view expressed in Saavedra v. State, 421 So.2d 725 (Fla. 4th DCA 1982), may undertake a second assessment of the evidence at trial to ascertain its sufficiency by a preponderance test. By following each of the two tests, the trial courts are provided with the ability to balance the state's interests in effectively prosecuting conspiratorial criminality against the inherent hearsay evil which in other circumstances would bar the introduction of such evidence. The result we reached in Morales is explicated in our observation that:
[I]f the prosecution fails to meet its burden (preponderance) at the second determination and the defense makes a proper motion, the sanction is either a curative instruction regarding the hearsay evidence or a mistrial. At that point a defendant would not be discharged as he would be if a motion for judgment of acquittal is granted.
460 So.2d at 415.
Within a backdrop of the principles discussed above, we hold that the trial court was in error in its finding that the state failed at the in limine hearing "to establish by sufficient independent evidence the existence of a conspiracy." Substantial evidence was tendered to the trial court, free from the taint of hearsay, upon which it could find, at the very least preliminarily, that a conspiracy existed and that the Wilsons were active participants in the accomplishment of its objectives.
The evidence adduced at the in limine hearing may be summarized as follows:
William Horsman met Pauline at the Quaker Bar in Dade City. Pauline told Horsman that her husband, Leroy, wanted to talk to him. Horsman, in the company of Jessie Haynes, went to Leroy's home. Leroy asked Horsman if he could do something to set-up his daughter-in-law in order to prove her an unfit mother. Horsman devised a plan to plant marijuana on the daughter-in-law. Leroy gave Horsman $150 which was to pay him for his services and to purchase the marijuana. During the meeting at Leroy's home, Haynes was present but silent. Horsman and Haynes left Leroy's home and, together, bought the marijuana. On the evening of that same day, Horsman and Haynes met Leroy at the Citgo station, and the three of them, in Leroy's car, drove to the location of a trailer in Zephyrhills where Tina Wilson lived. After Leroy identified the trailer, they returned to the Citgo station where Horsman had left his car. During the ride to the Citgo station, there was discussion among Horsman, Haynes, and Leroy, initiated by Leroy, "that they wanted to prove her (Tina) unfit." Haynes expressed the idea, "Why don't we just go ahead and waste her." Leroy responded, "If this doesn't work, we'll consider that." After reaching the Citgo station, Horsman and Haynes drove back to the Zephyrhills trailer, placed a bag of marijuana outside of it, and then went to a nearby convenience store to telephone the Pasco County Sheriff's office to request that a deputy meet them. When the deputy arrived at the store, he was told that the girl living in the trailer was selling marijuana. The deputy went to the trailer, and Horsman and Haynes returned to Dade City. At a later time, Horsman saw the deputy in Dade City and asked him what happened at the *1155 trailer. The deputy said that he found the marijuana, but, because it was not inside the trailer, he could do nothing about it.
A short time after hearing from the deputy that the marijuana effort had failed, Horsman again saw Pauline at the Quaker Bar and reported to her the unsuccessful outcome of the marijuana mission. On that same occasion, Pauline told Horsman to "come over to the house." Pauline also told Horsman to bring Jessie Haynes with him. Horsman and Haynes complied and went to Leroy's house in Dade City. Leroy, Pauline, Horsman, and Haynes met in the house. Upon entering the house, Pauline said, "We decided we would go along with Jessie's idea." Horsman left and waited in his car for Haynes who remained in the house. Haynes stayed in the house for ten or fifteen minutes. Immediately upon leaving Leroy's house, Horsman, following Haynes directions, drove to an apartment building on Howard Street where Kathy Kidd lived. Horsman and Haynes went to a unit in the apartment building and knocked on a door but received no response. Horsman drove Haynes into the country to a bar-restaurant known as "Saul's Place." Approximately one week later, Horsman again met Pauline at the Quaker Bar. Horsman started the conversation saying, "You all ain't really going to go through with this thing?" Horsman mentioned "the fact that I didn't think it was worth it. That it could be handled another way and to let me and Crazy Fred try to handle it another way and prove her unfit." Pauline said, "Jessie would take care of it." At a later time, in the Quaker Bar, in a conversation with Horsman, Pauline said, "tell Jessie to hold off until after David goes to court." (David is the son of Leroy and Pauline.) Horsman told Jessie to "hold off." Sometime thereafter, at another meeting at the Quaker Bar, Pauline, Leroy, and Horsman spoke, and Pauline told Horsman that "David had gotten five years probation" and that "she wanted to talk to Jessie." That same day Horsman told Jessie that Pauline wanted to see him. Jessie and Pauline then met in the parking lot at the Quaker Bar. Although Horsman did not participate in or hear the conversation, he did see them at the parking lot together.
Horsman testified that on the day following Tina's murder he was with Jessie Haynes at Saul's Place and that he observed Haynes and Saul, the owner of Saul's Place, leave together and return after the lapse of an hour or two. Saul testified that during their absence from his bar-restaurant, he and Haynes first went to "Pauline and Leroy Wilson's house" and then to a place to purchase meat for a party paid for by Haynes. The party occurred at Saul's Place on the same day that Saul and Haynes visited Leroy and Pauline Wilson.
We conclude there is substantial evidence of a conspiracy and the participation in it by Pauline and Leroy Wilson. We reach our conclusion by simply looking to and following the supreme court's restatement in Duval Utility Co. v. Florida Public Service Commission, 380 So.2d 1028, 1031 (Fla. 1980), of the definition given of "competent substantial evidence" in De Groot v. Sheffield, 95 So.2d 912, 916 (Fla. 1957): "such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred ... [or] such relevant evidence as a reasonable mind would accept as adequate to support a conclusion."
We have no difficulty in finding that Leroy and Pauline joined in a scheme initially to discredit, but ultimately to kill, Tina, a fact which would be unreasonable not to infer upon the present record. The competent, substantial evidence developed before the trial court is more than adequate to support the determinations that a conspiracy existed and that Leroy and Pauline were active, willing, and knowing participants in it and its objectives. It is an imposition upon our credulity to contend, as Leroy does, that no competent evidence was introduced connecting Pauline's statement that "[w]e decided we would go along with Jessie's idea" to Jessie Haynes' earlier suggestion that they "just go ahead and waste her." It is the rare instance when a *1156 court is able to form a conclusion from direct evidence of the existence of a conspiracy. We, as well as the trial court, are empowered to draw reasonable inferences from admissible, uncontroverted testimony. In keeping with the role assigned to us at this stage of the proceedings, we draw that which we judge to be a reasonable inference  Leroy and Pauline subscribed to Jessie's proposed alternative solution to their "Tina problem."
Finally, for whatever effect it has upon this matter, we pretermit any contention that the adoption of Jessie's proposal altered or in any manner affected either the conspiracy, its end objective, or its continuum. One conspiracy was formed, and it was only upon the failure of the original means that subsequently another technique, albeit producing a different and more severe result, was chosen by the conspirators for the achievement of their ends. We agree with the principle that "when a plot contemplates a result which cannot continue without the continuous cooperation of conspirators, and there is such continuous cooperation, the conspiracy is one, not several." Epps v. State, 354 So.2d 441, 442 (Fla. 1st DCA 1978).
Furthermore, as was stated by the Supreme Court of Florida:
It is well established that a single conspiracy may have for its object the violation of two or more criminal laws or two or more substantive offenses. The conspiracy is one offense and a single offense, no matter how many repeated violations of the law may have been the object of the conspiracy.
Brown v. State, 130 Fla. 479, 178 So. 153, 156 (1938).
The original conspiracy was never abandoned or otherwise terminated by the conspirators prior to the moment when the ultimate, chosen objective was fulfilled. Cf. Cam v. State, 433 So.2d 38, 39-40 (Fla. 1st DCA 1983).
Reversed and Remanded for further proceedings consistent with this opinion.
SCHEB, A.C.J., LEHAN, J., and BOARDMAN, EDWARD F., (Ret.) J., concur.