528 So.2d 15 (1988)
Olga ROMANI, M.D., Appellant,
v.
The STATE of Florida, Appellee.
No. 83-787.
District Court of Appeal of Florida, Third District.
May 24, 1988.
Rehearing Denied July 26, 1988.
*16 Bradley R. Stark, Miami, for appellant.
Robert A. Butterworth, Atty. Gen., and Michael J. Neimand, Asst. Atty. Gen., for appellee.
Before HENDRY, HUBBART and FERGUSON, JJ.
HENDRY, Judge.
Defendant, Dr. Olga Romani, was charged with conspiracy to commit first degree murder and the first degree murder of Dr. Gerardo DeMola. Dr. DeMola was killed on February 18, 1981 in the parking lot of a hospital where he worked. At Dr. Romani's trial the state presented the occasionally conflicting testimony of several unindicted coconspirators and codefendants.[1] They described a scheme involving numerous characters who allegedly, acting at Romani's behest, entered into a series of contracts and subcontracts to murder Dr. DeMola. The jury found defendant guilty on both counts. She was sentenced to life imprisonment on the first degree murder count and thirty years imprisonment on the conspiracy count. Romani appealed.
In her appeal Romani contends the trial judge made erroneous evidentiary rulings. Specifically, she claims the trial judge wrongfully admitted: (1) the hearsay statements of coconspirators without establishing by a preponderance of independent evidence the existence of a conspiracy and defendant's participation in the conspiracy; (2) coconspirator statements which were not made during the course, and in furtherance of the conspiracy; (3) statements made by nontestifying coconspirators which incriminated defendant without affording her an opportunity to cross-examine the declarants as provided by the sixth amendment and Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We reject all of defendant's arguments and affirm the convictions.
According to testimony offered by the state's first witness, Romani's employee, Hortensia Mercedes Alvarez, Romani approached Alvarez and asked if she knew of anyone who could "get rid of these people," *17 handing Alvarez a paper with the names of several individuals, among them Dr. DeMola.[2] Alvarez claimed Julio Garcia, another employee of Romani's, was present during this conversation. Garcia denied hearing this initial conversation, but did testify Romani also asked him if he knew of anyone who would commit a murder for money. Alvarez later told Garcia that Romani wanted to have DeMola killed. Alvarez testified to having asked her son, Anthony Anderson, if his friend, Roger Ibarra, would be willing to commit the murders.
Alvarez stated she met with Anderson, Garcia, and Ibarra to discuss the proposed murders. Ibarra later agreed to commit the murders for $10,000 per person. Alvarez attested Romani agreed to these terms and entrusted Alvarez with $5,000 to give Ibarra as an initial payment. Alvarez ratified the agreement with Ibarra and handed him the $5,000 and the list of names. About a week or two later, Alvarez recalled hearing the news of DeMola's murder on the radio. She hurried to Romani's home to relay the news to the doctor, but Romani had already learned of the homicide when Alvarez arrived. Alvarez next told the jury of a dinner she subsequently had with Romani, Ibarra, and Garcia at a restaurant in which Romani brought the final $5,000 payment. Alvarez claimed she gave the money to Garcia who was to pass it on to Ibarra. Garcia, who corroborated having dinner and drinks with Romani, Ibarra and Alvarez after the murder, denied participating in any murder scheme or giving Ibarra any money.
After Alvarez testified, but prior to the state's introduction of testimony by other coconspirators, defense counsel informed the judge she wanted to object to the proposed testimony. Defense counsel anticipated these witnesses would be introducing hearsay statements made by other coconspirators. The trial judge stated he had discretion to accept such testimony before the conspiracy was established; nevertheless, he believed Alvarez's testimony had established the conspiracy, independent of any coconspirator's testimony. Defense counsel contended the conspiracy and defendant's participation had not been established by independent evidence. Defense counsel then requested the judge give the jury cautionary instructions regarding the conspiracy. Thereupon the jury was called in and the judge instructed them that "the conspiracy itself, and each member's participation in it must be established by independent evidence before you can consider the statements of coconspirators."
In the testimony that followed, Roger Ibarra confirmed he met with Alvarez, Garcia and Anderson, at Anderson's suggestion, and agreed he would commit the murders himself or find someone else to be the triggerman. Ibarra then went to see Antonio Gonzalez Valdibia, to subcontract the murders. According to Ibarra, Gonzalez consented to the murder scheme, but wanted to enlist the assistance of a friend, Alberto Vinas. Gonzalez took Ibarra to see Vinas, who agreed to commit the murders for $10,000 per person. Ibarra confirmed the sum with Alvarez. Ibarra retained $1,000 of the initial $5,000 he received from Alvarez and turned over the remaining $4,000 to Gonzalez and Vinas, along with the list of names.
According to the original plan, the first person on the list to be murdered was to have been John Nulty, the Medicaid fraud investigator. Ibarra testified he, Gonzalez and Alvarez conducted a surveillance of Nulty. Ibarra later decided Nulty was too difficult a target. On his own initiative Ibarra selected DeMola as the first victim, but he did not inform Alvarez or Anderson of this change.[3] Alvarez denied *18 ever meeting Gonzalez or participating in any surveillance of Nulty.
After an undetermined number of days, Ibarra became concerned he had not heard any news regarding DeMola's death. He arranged a meeting with Gonzalez and Vinas at a bar. While at the bar, Ibarra testified that he, Vinas and Gonzalez were approached by two individuals who were introduced as Heriberto Nodarse and Papo. Nodarse and Papo allegedly told the others not to worry, that DeMola was dead.
Ibarra recounted joining Romani,[4] Alvarez, and Garcia at a restaurant to "celebrate the news" sometime after being told of the murder. According to Ibarra's report of the evening, Garcia first attempted to give Ibarra the final $5,000 payment, but was unable to do so safely. Ibarra claimed that sometime during the course of the evening Romani presented him with an envelope containing the final $5,000. Very late that same evening Ibarra rendezvoused with Gonzalez and Vinas. Together they heard the news of DeMola's murder on the radio. Ibarra then gave Gonzalez and Vinas $4,000 and kept another $1,000 for himself.
Antonio Gonzalez Valdibia offered testimony which at times conflicted with Ibarra's version of the events. Gonzalez claimed he declined to participate in the murders when Ibarra first approached him, but he nonetheless took Ibarra to see Vinas. Gonzalez maintained this was the extent of his participation. He learned the details of the murder scheme from Vinas. Approximately a week after Ibarra initially approached Gonzalez, Ibarra handed him an envelope containing $4,000 to deliver to Vinas. Vinas took $2,000 and paid Gonzalez with the remaining $2,000 to "keep his mouth shut." Sometime after this episode, Vinas informed Gonzalez that he was going to subcontract the murder. Gonzalez accompanied Vinas to a bar later that day, where he observed Vinas talking to three individuals outside. Shortly thereafter, Gonzalez learned the individuals were Nodarse, William and Papo, the men Vinas allegedly paid to kill DeMola. On cross-examination Gonzalez denied ever meeting Alvarez, conducting any surveillance of Nulty, or actively participating in the murder of DeMola.
Evidence was presented at trial that thirteen days before the murder, Romani withdrew $10,000 from her bank account. She kept $5,000 in cash and deposited the remaining $5,000 in a new bank account. Six days later, $4,800 was withdrawn from the new account. A hospital employee, who worked at the hospital where DeMola was killed, testified he observed two suspicious latin-looking men in the doctors' parking lot and later saw them jump into the back of a white pickup truck driven by another man and speed away, shortly before he discovered the body of DeMola. Gonzalez in his testimony reported Nodarse drove a white pickup truck. All the conspirators who testified, with the exception of Romani, denied ever meeting DeMola.
At the close of the state's case and again after the defense rested, defense counsel moved for a judgment of acquittal and to exclude the hearsay statements of the co-conspirators. The court denied the motions, ruling that sufficient evidence had been adduced to show a conspiracy between the named parties.
A discussion of the law surrounding the coconspirator hearsay exception is in order before addressing the first issue defendant raises. Under section 90.803(18)(e), Florida Statutes (1987), hearsay statements made by one member of a conspiracy are admissible against other members of the conspiracy provided the statements were made during the course, and in *19 furtherance of the conspiracy.[5] Florida case law additionally requires that before a coconspirator's statement is admissible, independent evidence must be introduced establishing the conspiracy and defendant's and declarant's participation in the conspiracy. Honchell v. State, 257 So.2d 889 (Fla. 1971); Tresvant v. State, 396 So.2d 733 (Fla. 3d DCA), review denied, 408 So.2d 1096 (Fla. 1981). The quantum of proof the government must present to establish the existence of a conspiracy is not specified by either the Florida or the Federal Evidence Code.[6] Initially federal and state courts provided no consensus on the appropriate quantum of proof; the courts had adopted tests ranging from "slight evidence," "substantial evidence," to a "preponderance of the evidence." Briklod v. State, 365 So.2d 1023, 1026 n. 5 (Fla. 1978); Tresvant, 396 So.2d at 740 n. 10. Whether a judge, a jury, or both should make these determinations was also unclear.
United States v. James, 590 F.2d 575 (5th Cir.), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), helped resolve these issues by establishing a new standard and procedure for handling the admissibility of coconspirator statements in light of the Federal Rules of Evidence.[7] Relying on Federal Rule of Evidence 104(a),[8] the James court concluded that preliminary questions of admissibility must be determined by a judge alone; "[t]he jury is to play no role in determining the admissibility of statements." 590 F.2d at 580. James adopted a two-prong procedure. First, in making an initial determination of admissibility, the judge applied a substantial evidence standard. 590 F.2d at 580-81. Then, after all the evidence was presented, the trial judge determined whether the prosecution had shown by a preponderance of independent evidence that (1) the conspiracy existed, (2) the conspirators and the defendant were members of the conspiracy, and (3) the statements were made in the course and in furtherance of the conspiracy. 590 F.2d at 582.
In Florida the fourth district in Saavedra v. State, 421 So.2d 725 (Fla. 4th DCA 1982), concluded that Florida Evidence Code section 90.105(1)[9] was patterned after Federal *20 Rule 104(a) and likewise imposed the same responsibility of determining preliminary questions of admissibility on the trial judge. The fourth district accepted that the preponderance of the evidence standard should be applied by the trial judge at the conclusion of all the evidence as set forth in James, but Saavedra failed to address what quantum of proof should be applied by the court in its preliminary determination of admissibility. This issue was addressed by the second district court, in State v. Morales, 460 So.2d 410 (Fla. 2d DCA 1984), which adopted the entire two-part test proposed in James for handling the admissibility of coconspirator statements.
The correctness of the Morales and Saavedra holdings has now been called into question by a recent United States Supreme Court opinion, Bourjaily v. United States, 483 U.S. ___, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Bourjaily reevaluated the issue of admissibility of coconspirator statements in light of Federal Evidence Rule 104(a).[10] The Court began by confirming that the existence of a conspiracy and a defendant's participation in it were preliminary questions of fact decided by a judge under Rule 104(a), but the standard of proof the government must present to establish the existence of a conspiracy was not specified by the evidence rules. Relying on prior decisions which addressed the admissibility of other preliminary factual questions, such as United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (voluntariness of consent to search must be shown by a preponderance of the evidence) and Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (voluntariness of confession must be demonstrated by a preponderance of the evidence), the Court reasoned the same preponderance of the evidence standard should be applied in determining preliminary questions regarding admissibility of coconspirator statements. 107 S.Ct. at 2778-79.
This holding overrules that portion of the James decision which held a court should apply the substantial evidence standard in its preliminary analysis. The second prong of James, applying a preponderance of the evidence standard at the conclusion of all the evidence, becomes redundant inasmuch as a court is now required to apply this standard in its preliminary determination. The Florida cases, including Morales and Saavedra, which followed James are no longer sound law. We therefore adopt the holding of Bourjaily that "when the preliminary facts relevant to [section 90.803(18)(e)] are disputed, the offering party must prove them by a preponderance of the evidence." 107 S.Ct. at 2779.[11]
The Bourjaily decision is most far-reaching in its analysis of the type of evidence a court may consider in determining the existence of a conspiracy and defendant's participation in it. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) held that coconspirator statements were admissible against a defendant only if there was "proof aliunde" (independent *21 proof) that the defendant was connected with the conspiracy; "[o]therwise, hearsay would lift itself by its own bootstraps to the level of competent evidence." 315 U.S. at 74-75, 62 S.Ct. at 467. The so-called "bootstrapping rule" was interpreted by many courts to mean that a court should not consider hearsay statements in determining preliminary facts under Rule 801(d)(2)(E). The Bourjaily Court rejected this reading of Glasser, contending the holding could also be interpreted to mean that a court must have some independent proof, but it could also look at the hearsay statements themselves in reaching its preliminary determination. 107 S.Ct. at 2780. This analysis was found to be consistent with the Federal Evidence Rules. Federal Evidence Rules 104(a) and 1101(d)(1) provide that a court in making preliminary determinations of admissibility is not bound by the rules of evidence (except with respect to privileges).[12] The Court concluded the language in these rules was sufficiently clear to indicate that after the enactment of the Federal Rules of Evidence the bootstrapping rule was no longer viable. 107 S.Ct. at 2780. Additionally, Bourjaily noted that a per se rule prohibiting the consideration of hearsay statements was unnecessary. Hearsay statements "are only presumed unreliable"; appropriate proof could rebut the presumption. Furthermore, "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." 107 S.Ct. at 2781.
The Florida Evidence Code does not contain a provision equivalent to that found in the Federal Rules stating a judge is not bound by the rules of evidence in making preliminary determinations. No Florida cases have had an opportunity to construe this difference between the Federal and Florida Rules of Evidence. Nonetheless, at least two commentators have argued that the absence of this sentence should not be interpreted to mean that a judge is required to abide by the evidence rules in making preliminary determinations.[13] "As a practical matter, it would be impossible for a judge to follow all the rules of evidence in making preliminary determinations." 31 U.Miami L.Rev. 951, 954 (1977). The fourth district, in Saavedra, recognized that section 90.105(1) is patterned after Federal Evidence Rule 104(a). 421 So.2d at 725. Furthermore, it is well-established law in this state that if a Florida law is patterned after a federal law, on the same subject, it should be given the same construction in the Florida courts as its prototype has been given in the federal courts insofar as such construction is harmonious with the spirit and policy of Florida legislation on the subject. State v. Cook, 108 Fla. 157, 146 So. 223, 224 (1933); Pasco County School Board v. Florida Pub. Employees Relations Comm'n, 353 So.2d 108, 116 (Fla. 1st DCA 1977); accord Sike v. Seaboard Coast Line R. Co. 429 So.2d 1216 (Fla. 1st DCA 1983); Dinter v. Brewer, 420 So.2d 932 (Fla. 3d DCA 1982). Having found no authority to the contrary, we find the commentators' arguments to be persuasive in construing section 90.105(1). Accordingly, we hold that a judge, "in making a preliminary factual determination under [section 90.803(2)(e)], may examine hearsay statements sought to be admitted[,]" *22 Bourjaily, 107 S.Ct. at 2782, and "give [the evidence] such weight as his judgment and experience counsel." United States v. Matlock, 415 U.S. 164, 175, 94 S.Ct. 988, 995, 39 L.Ed.2d 242 (1974).
In the instant case, the trial judge recognized his discretion to accept coconspirator statements subject to determining the elements of section 90.803(18)(e) had been established. After listening to Hortensia Alvarez, the state's first witness, the judge concluded her testimony had established the conspiracy. Nonetheless, defense counsel argued that defendant's participation had not been established by independent evidence. Thereupon, the trial judge gave the jury the requested Apollo instruction and proceeded to allow the state to present the testimony of the other coconspirators. At the close of the state's case, defense counsel moved for a judgment of acquittal and again sought to exclude hearsay statements of the coconspirators. The court denied the motions and we find that the record would support such a denial under the preponderance of the evidence standard.
Bourjaily allows the trial court to consider the out of court statements of other coconspirators, such as the declarations made by Vinas and the actual "hit men," Nodarse, William and Papo, provided some additional independent evidence is also introduced. A review of the record on appeal convinces us that independent and circumstantial evidence of Romani's acts and declarations was introduced which showed Romani's participation in a conspiracy. Alvarez described how the conspiracy originated with Romani's desire to "get rid of" certain individuals. Alvarez's testimony revealed how she recruited other conspirators to carry out Romani's design and then served as Romani's liason with the conspirators, helping to arrange the details of the murder and the terms of payment. Ibarra's testimony provided further insight regarding the details of the conspiracy and murder. Evidence of Romani's withdrawal of $10,000 from a bank in $5,000 installments prior to the murder served to corroborate the testimony offered by Alvarez and Ibarra regarding the murder payments. In summary we conclude that the hearsay statements, although perhaps insufficient and unreliable when considered individually, when examined in their totality, combined with the independent and circumstantial evidence, clearly show by a preponderance of the evidence the existence of a conspiracy and defendant's participation in it.
Romani next contends the trial judge erroneously admitted coconspirator statements which were not made during the course and in furtherance of the conspiracy. Romani argues that the conspiracy terminated with the murder of DeMola; coconspirator statements identifying Vinas, Nodarse, William and Papo as the perpetrators were made after DeMola was murdered; therefore, the statements are not admissible.
A conspiracy ends when the object of the conspiracy has been accomplished, Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); this determination is made upon examining the particular facts of each case, using "common sense and human observation and experience." McDonald v. United States, 89 F.2d 128, 133 (8th Cir.1937). Taking a common sense view, a court could conclude a conspiracy had more than one objective. It is apparent that Romani's objective was the murder of DeMola. Her purpose in the conspiracy was achieved when DeMola was killed. On the other hand, coconspirators such as Ibarra, Vinas, Nodarse and Popo had a different purpose for entering into the conspiracy. Their objective was exclusively to make money illegally. These conspirators agreed to receive partial payment before the murder was committed and collect the balance after the murder was accomplished. Common sense would lead us to conclude that Ibarra and the others did not perceive an end to the conspiracy until they received full payment for their acts. Other courts have reached similar conclusions holding that where a general objective of the conspirators is money, the conspiracy does not terminate until the conspirators have received their payments. *23 United States v. Hickey, 596 F.2d 1082 (1st Cir.1979) (robbery was not the central objective, but merely the means to the central objective, which was obtaining cash illegally); United States v. Knuckles, 581 F.2d 305 (2d Cir.1978) (general objective of conspirators was to make money, not the distribution of drugs). Cf. United States v. Varella, 692 F.2d 1352 (11th Cir.1982) (conspiracy included conversations between conspirators after drug seizure regarding how to minimize and apportion their losses).
In Florida this point is aptly illustrated by Echols v. State, 484 So.2d 568 (Fla. 1985), which involved a hired killing, as in the instant case. In Echols after the murder was committed, undercover police met with the person who had contracted the murder to purportedly arrange details regarding the payment for the murder. The conversations were videotaped and later introduced as evidence against the defendant. The defendant, like Romani, argued the murder had already been committed, thus the statements were not made in the course and in furtherance of the murder conspiracy. The court disagreed, finding the videotape was admissible under section 90.803(18)(e). We likewise must disagree with defendant's contentions. Ibarra's meeting at a bar with Vinas and Gonzalez was to ascertain whether DeMola had been murdered. Upon learning Nodarse, William and Papo had slain DeMola, the next logical step was for Ibarra to inform Romani so as to collect the balance of the murder payment. The dinner meeting between Ibarra, Romani, Alvarez, and Garcia was arranged in part to pay Ibarra. With the final $5,000 in hand, Ibarra again met with Vinas to give Vinas his share of the spoils. Coconspirator statements made during these meetings were made during the course, and in furtherance of the conspiracy.
The last point Romani raises is that the judge wrongfully admitted statements made by nontestifying coconspirators which incriminated her without affording her an opportunity to cross-examine the declarants as provided by the confrontation clause of the sixth amendment and Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The confrontation clause issue was also raised by the defendant in Bourjaily. The Court reiterated that a statement admissible under the coconspirator exception did not violate the confrontation clause. First, as the Court held in United States v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the need to establish unavailability is not required when the hearsay statement is the out of court declaration of a coconspirator. Bourjaily, 107 S.Ct. at 2782. Second, when the evidence sought to be admitted falls within one of the firmly rooted hearsay exceptions, as is the case with the coconspirator exception, the need to independently establish the reliability of the evidence is also not required. Id. 107 S.Ct. at 2783. Following Bourjaily, we reject defendant's confrontation clause argument.
In accordance with the foregoing reasons and authorities we affirm defendant's convictions and sentences.
Affirmed.
NOTES
[1] The grand jury indictment named Olga Romani, Roger Ibarra, Antonio Gonzalez Valdibia and Albert Vinas as codefendants. Romani's trial was severed from that of the other codefendants. Ibarra and Gonzalez ultimately agreed to plead guilty to reduced charges in exchange for their testimony against Romani. Codefendant Vinas had not entered into any plea agreement when the trial commenced, thus he did not testify against Romani. Three of the unindicted coconspirators, Heriberto Nodarse, "William" and "Papo," also did not testify; they had not been apprehended when Romani's trial began.
[2] Romani was the subject of a Medicaid fraud investigation. Romani suspected DeMola to be the government's chief witness against her. Two other individuals on the list were John Nulty, an investigator assigned to Romani's case, and James Harris, a former employee. Romani was subsequently convicted of Medicaid fraud and violation of the Racketeer Influenced and Corrupt Organizations Act. The convictions were affirmed on appeal. Romani v. State, 429 So.2d 332 (Fla. 3d DCA 1983).
[3] "[A] single conspiracy may have as its object the violation of two or more ... substantive offenses." Brown v. State, 130 Fla. 479, 178 So. 153, 156 (1938). This conspiracy was formed to kill the individuals on the list. Contrary to defendant's contention, the change in the order of the murders did not alter or in any manner affect the conspiracy, its objective, or continuation. State v. Wilson, 466 So.2d 1152 (Fla. 2d DCA 1985).
[4] Ibarra offered conflicting testimony regarding when he first met Romani. He first claimed to have met her before the murder, at her clinic, whereupon she informed him of the Medicaid fraud investigation. Later Ibarra stated he met Romani for the first time after the murder.
[5] Section 90.803(18)(e), Florida Statutes (1987), provides:

A statement by a person who was a coconspirator of the party during the course, and in furtherance, of the conspiracy. Upon request of counsel, the court shall instruct the jury that the conspiracy itself and each member's participation in it must be established by independent evidence, either before the introduction of any evidence or before evidence is admitted under this paragraph.
[6] Federal Evidence Rule 801(d)(2)(E) states that:

"(d) A statement is not hearsay if 
* * * * * *
(2) The statement is offered against a party and is
* * * * * *
(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."
[7] Before the adoption of the Federal Evidence Code, United States v. Apollo, 476 F.2d 156 (5th Cir.1973), appeal after remand, 490 F.2d 861 (1974), overruled, 590 F.2d 575, cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), provided controlling authority for the admissibility of coconspirator statements in the Fifth Circuit. Apollo divided the responsibility of determining admissibility between the judge and the jury, but gave the jury a central role. First, before coconspirator statements were admitted, the judge had to be satisfied that the prosecution had presented a prima facie case that the conspiracy existed and the defendant and the declarant were members of the conspiracy. Once admitted, the jury was then instructed to consider the statements only if it first found the conspiracy existed, the defendant and the declarant were members of the conspiracy, and the statements were made in the course and in furtherance of the conspiracy. Apollo, 476 F.2d at 163. See generally, C. Ehrhardt, Florida Evidence § 803.18f (2d Ed. 1984). What came to be known as an Apollo instruction was included in the last sentence of section 90.803(18)(e) of the Florida Evidence Code, which became effective in 1979. See supra note 5. The federal counterpart does not contain this provision. See supra note 6.
[8] Federal Evidence Rule 104(a) states:

"(a) Preliminary questions concerning ... the admissibility of evidence shall be determined by the court... . In making its determination it is not bound by the rules of evidence except those with respect to privilege."
[9] Section 90.105(1) provides in pertinent part that:

"the court shall determine preliminary questions concerning ... the admissibility of evidence."
[10] After the adoption of the Federal Rules of Evidence several of the circuits reasoned that when determining preliminary matters of admissibility, Rule 104(a) imposed a greater duty upon the courts than simply to be satisfied that a prima facie case existed. These courts selected a preponderance of the evidence standard. See United States v. Enright 579 F.2d 980 (6th Cir.1978), relied upon by United States v. Bourjaily, 781 F.2d 539 (6th Cir.1986). See generally, 1 J. Weinstein & M. Berger, Weinstein's Evidence § 104[05] at 104-56  104-63 (1986).
[11] Although Apollo was overruled by James, the Apollo instruction lives on in Florida by virtue of its inclusion in Florida Evidence Code section 90.803(18)(e). Morales, 460 So.2d at 413. Some other jurisdictions have discontinued the instruction, viewing it as potentially confusing and inconsistent with the role of the judge; nonetheless, several other jurisdictions have continued to use the instruction, concluding it only serves to favor defendants by giving them added protection. See 1 Weinstein's Evidence, § 104[05] at 104-63. One Florida commentator has stated this latter view "seems desirable in light of the danger of prejudice to the defendant and the questions raised concerning the reliability of many co-conspirator admissions." Florida Evidence § 803.18f at 534. The advent of Bourjaily and its more stringent standard of proof, however, has lessened the danger of prejudice to defendants, thus this reason for the Apollo instruction is no longer persuasive. See Enright, 579 F.2d at 987; United States v. Dennis, 183 F.2d 201, 230-31 (2d Cir.1950) (L. Hand, J.).
[12] See supra note 8 for text of Federal Evidence Rule 104(a). Federal Rule 1101(d)(1) in pertinent part states:

"(a) The rules (other than with respect to privileges) do not apply in the following situations: (1) The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104."
[13] W. Hicks & J. Matthews, Evidence, 31 U.Miami L.Rev. 951 (1977); M. Graham, Handbook of Florida Evidence §§ 103.1, 105.1 (1987). Weinstein's Evidence § 104[13], discusses at length the adaptation of Federal Rule 104 by the various states. At least three states, Washington, Oklahoma, and Nebraska, have provisions virtually identical to section 90.104(1), omitting the last sentence found in Federal Rule 104(a). The commentary following Rule 104, Washington Rules of Evidence, states that despite this omission, it is generally the prevailing view that a judge is not bound by the rules of evidence in preliminary determinations. The commentary following the Oklahoma rule, Okla. Stat. Ann. tit. 12 § 2105, refers the reader to section 2103 which is the equivalent to Federal Rule 1101. But the omission in the Nebraska rule, Neb. Rev. Stat. § 27-104(1), has been interpreted to mean that all rules of evidence are applicable in preliminary hearings.